**THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| WILLIAM BEYERS<br>individually and on behalf of all others<br>similarly situated, | ) ) ) | |
| | ) | Case No. |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CLASS ACTION COMPLAINT |
| LIBERTY MUTUAL INSURANCE | ) ) | JURY DEMAND |
| Defendant. | ) ) ) | |

**CLASS ACTION COMPLAINT**

COME NOW the Plaintiff William Beyers, individually and on behalf of a class of all others similarly situated (collectively "Plaintiff"), and state and allege as follows for their Class Action Complaint against the Defendant, Liberty Mutual Insurance, ("Liberty Mutual").

### I.    PARTIES, JURISDICTION, AND VENUE

1. Plaintiff William Beyers is a resident of Hamilton County, Indiana. At all times relevant hereto, Plaintiff owned a home located in Hamilton County, Indiana. ("Insured Premises").

2. Liberty Mutual is authorized to sell homeowner's property insurance policies in the State of Indiana and is also engaged in the insurance business in the State of Indiana.

3. This Court has diversity jurisdiction pursuant to 28 USC § 1332. The venue is proper because: Liberty Mutual's conduct resulting in this lawsuit occurred in the Southern District of Indiana and Plaintiff resides in this judicial district.

## II.    FACTUAL ALLEGATIONS

### A.  COMMON FACTS RELATED TO ALL CLAIMS

4.  At all times relevant hereto, Plaintiff was the beneficiary of an insurance contract (bearing Policy No. H3X-248-402908-40) whereby Liberty Mutual agreed to insure the Insured Premises against property damage, (the "Policy").

5.  On or around April 26th, 2017, Plaintiff incurred a damage to the Insured Premises ("Property Damage" or "Loss"). On or about September 7th, 2017 Liberty Mutual inspected the Insured Premises and determined that the Loss was covered by the terms of the Policy.

6.  Pursuant to Defendant's own estimate, Plaintiff was entitled to the following repairs and replacements. ("Covered Repairs") caused by the Loss:

    I.    Replacement of R&R Gutters and Downspouts for the Right, Left and Rear Elevation

    II.    Replacement/Repair of R&R window Screen for the Rear Elevation.

    III.    Removal and installation of Shingles and Felt

    IV.    Replacement of Flashing & Pipe Jack

    V.    Replacement of Roof Vent

    VI.    Replacement of Continuous Ridge Vent

    VII.    Replacement of Ridge Cap

    VIII.    Replacement of Ridge and Hip - Gable Cornice Return

**Exhibit A – Defendant's Estimate**

7.  Defendant provided an estimate of the Actual Cash Value ("ACV") of their Loss to the Plaintiff on September 7, 2017 based upon an estimate of the Covered Repairs ("Estimate").

8.  Defendant has already issued a payment in accordance with its Estimate to the Plaintiff.

("Payment").

9. Upon information and belief, Plaintiff contends that the Policy at issue in this case is attached as Exhibit B to this Complaint. **Exhibit B, Base Policy.**

10. Pursuant to the Policy, the Plaintiff purchased insurance coverage for the "dwelling" and "structure attached to the dwelling" under Coverage A. **Exhibit B, Base Policy, Section I – Property Coverages, Coverage A.** The dwelling for purposes of the Policy is the Insured Premises. **Exhibit B; p. 3**

11. Pursuant to the Policy, the Defendant provided insurance coverage against the risk of direct physical loss to the Insured Premises. **Exhibit B, Base Policy, Section I – Perils Insured Against – Coverage A Dwelling and Coverage B Other Structures.**

12. Following the Property Damage, Plaintiff complied with all the conditions and requirements under the terms of the Policy.

13. Plaintiff was current with his monthly premium payments at the time of the Loss and had made such premiums to insure against the risk of loss to the Insured Premises.

14. Since there was no applicable exclusion in the Policy and Plaintiff had complied with all condition precedents for coverage, the Loss was compensable under the Policy.

15. Plaintiff made a claim under the Policy for reimbursement of the ACV of the Property Damage.

16. Defendant offered to and disbursed payments for the Covered Repairs in the amount of $11,585.96 **("Net Claim").** Defendant calculated the Net Claim based upon the ACV of Covered Repairs.

**B. OVERHEAD AND PROFIT**

17. General Contractors are entities which provide day to day oversight of a construction site, management of vendors and trades, and the communication of information to all involved

3

parties throughout the course of a building project. General Contractors are specifically needed for home improvement projects where multiple different trades must be employed and consequently the project requires coordination of efforts between the tradesman as well as day to day supervision and management.

18. According to Xactimate the term "Overhead" is described as "any additional expense not charged (attributed) directly to the work being performed. **Exhibit C.**

19. There are different types of Overhead costs associated with home renovations and repairs. Xactimate recognizes three different categories of Overhead costs: (1) General Overhead; (2) Job Related Overhead; and (3) Job Personnel/Sub-contractor Overhead. **Exhibit C.**

20. General Overhead costs are defined as "expenses incurred by a General Contractor, that cannot be attributed to individual projects, and include any and all expenses necessary for the General Contractor to operate its business ("General Overhead Costs"). *Examples (including but not limited to):* General and Administrative (G&A) expenses, office rent, utilities, office supplies, salaries for office personnel, depreciation on office equipment, licenses, and advertising. Overhead expenses are not included in Xactimate's unit pricing but are typically added to the estimate as a percentage of the total bid along with the appropriate profit margin.

21. Profit is formally defined as "the excess of the selling price of goods over cost." As is the case in many industries, "Profits are typically added to the cost of a construction-related job to allow the entity performing the work to grow their company through reinvestment." ("Profit") **Exhibit C.**

22. General Overhead Costs and Profit together constitute what is normally referred to in the insurance restoration industry as General Contractor's O&P, or just O&P." (hereinafter collectively referred to as "Overhead and Profit"). **Exhibit C.**

23. Roof repair/replacement projects involving repairs/replacement of shingles and gutters are

typically and often exclusively performed by General Contractors.  This is true for any roof repairs/replacement project involving two or more trades.

24. Plaintiff's roof incurred hail damage and required repair/replacement of the roof and gutters ("Plaintiff's Roof Repair Project"). Plaintiff's Roof Repair Project entailed repair/replacement of the roof and gutters, each requiring specialized tradesman and equipment. Consequently, Plaintiff's Roof Repair Project required hiring a roofer to replace the shingles and a gutter specialist to repair the gutters.

25. Plaintiff's Roof Repair Project demanded a high level of coordination between the different tradesmen and day to day supervisions and management and consequently required the use of a General Contractor. Given the complexity of work and involvement of multiple tradesmen in Plaintiff's Roof Repair Project it was not feasible for Plaintiff to coordinate and supervise the completion of the Roof Repair Project himself. Any such General Contractor or entity used for Plaintiff's Roof Repairs Project would: inevitably incur overhead costs, want to make a Profit on the project, and consequently assess Plaintiff a charge for Overhead and Profit costs.

26. Defendant should have added and paid for Overhead and Profits costs when calculating and disbursing the ACV of the Loss incurred by the Plaintiff.

27. Departments of Insurance for at least three states (Texas, Colorado and Kentucky) have previously found the failure to pay/consider Overhead and Profit costs when determining the ACV as improper.

28. The Payment issued and the Estimate provided by the Defendant to the Plaintiff for the Loss, excluded reimbursement for Overhead and Profit costs. **Exhibit A – Estimate.**

29. Xactimate allows an insurance adjuster to choose whether to provide full payment for Overhead and Profit costs when calculating the ACV.

30. When Defendant adjusted the Loss, it purposefully manipulated Xactimate to disallow

Overhead and Profit.

31. That act was intentional and done with malice and done in accordance with Defendant's internal policies.

### C. ICE AND WATER SHIELD

32. The ice-and-water shield is a membrane installed between the roofing shingles and the roof deck ("Ice and Water Shield"). The membrane provides a water proof barrier to protect major penetration points in the roof.

33. The Ice and Water Shield is often installed on parts of a roof which are most susceptible to ice dams (ridge of ice that forms at the edge of a roof and prevents melting snow from draining off the roof) and wind driven rain. Such areas include but are not limited to Eaves, Rake edges, overhangs and Valleys. **Figure 1 identifies different parts of a roof including eaves, rake edges, overhang, and valleys; Figure 2 shows an image of an ice dam.**



**Figure 1**



**Figure 2**

34. The valley of a roof is the Vee shaped metal channels that run up and down the 'folds' of a roof as illustrated in Figure 1 ("Valley").

35. Defendant's Estimate and Payment did not include the cost of installing Ice and Water Shield in the Valleys. **Exhibit A – Estimate.**

36. The Estimate indicates that the Ice and Water Shield "did not previously exist or expands the scope of repairs but is required by current building codes. The code upgrade cost is payable when incurred, subject to limits." *Id.*

37. However, the Estimate is wrong, and Ice and Water Shield was previously installed at least in the Valleys of the roof on the Insured Premises.

38. It has been a customary industry wide practice of contractors to install Ice and Water Shield in the Valleys of roofs for well over a decade.

39. Defendant should have known that the Ice and Water Shield previously existed on Plaintiff's roof.

40. When Defendant adjusted the Loss, it purposefully left out the ACV of installing Ice and Water Shield in the Valleys despite its knowledge that Ice and Water Shield was previously

installed there.

41. That act was intentional and done with malice and done in accordance with Defendant's internal policies.

### D.  REMOVAL COSTS

42. Defendant's estimate for ACV of Plaintiff's damages includes specific line items for installation of flashing, roof vent, continuous ridge vent, and gable cornice return. **Exhibit A.**

43. Defendant's estimate does not consider the cost of dump fees, hauling, disposal and labor associated with the removal of flashing, roof vent, continuous ridge vent, and gable cornice return.

44. The aforementioned removal costs are necessary costs associated with Plaintiff's Roof Repair Project and must have been included in the ACV calculation.

45. When Defendant adjusted the Loss, it purposefully left out cost of dump fees, hauling, disposal and labor associated with the removal of flashing, roof vent, continuous ridge vent, and gable cornice return from its ACV calculations.

46. That act was intentional and done with malice and done in accordance with Defendant's internal policies.

### E.  STARTER STRIP

47. A Starter Strip is an integral component of a roof.

48. A Starter Strip shingle is an asphalt-based shingle utilized to waterproof the eave and rake edges. An Eave is defined as the edge of the roof that overhangs the face of a wall as illustrated in Figure 1. ("Eave"). A Rake is defined as the slanting edge of a gable roof at the end wall of the house as illustrated in Figure 1. ("Rake")

49. A Starter Strip is different than a typical shingle installed on a roof and is specifically designed

to serve its purpose.

50. Defendant has failed to include the cost of a Starter Strip in the Estimate. **Exhibit A.**

51. Defendant's Estimate includes the cost of a few extra shingles and suggests that Plaintiff should modify and use regular roof shingles to serve as Starter Strip shingles. This will not effectively waterproof the Eaves and Rakes of the roof.

52. The Starter Strip is both integral and necessary for Plaintiff's Roof Repair Project and must be included in the ACV calculation.

53. When Defendant adjusted the Loss, it purposefully left out the ACV of the Starter Strip from its Estimate.

54. That act was intentional and done with malice and done in accordance with Defendant's internal policies.

55. Internal policies.

**F.  COST OF REPLACEMENT SHINGLES**

56. In calculating the ACV of installing the replacement shingles ("Replacement Shingles") in place of the damaged shingles on the Insured Premises (" the Defendant uses two factors: the replacement cost value ("RCV") of the shingles which need replacement; and the depreciation value of the damaged shingles ("Depreciation").

57. Defendant calculated the RCV for the damaged shingles by: taking the total squares of shingles which must be installed and multiplying it by the total cost of purchasing and installing each square; and adding applicable tax.

58. In calculating the cost of purchasing the Replacement Shingles, Defendant admittedly used a shingle material allowance of $75.44 per square. **Exhibit A.**  Defendant claimed that the $75.44 allowance reflects the market price in Plaintiff's residential area. In support of this

assertion, Defendant claimed that "Market prices were verified by MRP's Managed Material Program. The MRP Managed Material Program allows you or your contractor of choice to have materials delivered directly to your home for installation." *Id.*

59. MRP is a company based out of Colorado. MRP MADSKY, https://madskymrp.com/about/ (March 25th, 2019).

60. MRP does not have distribution centers in Indiana.

61. General Contractors operating in Indiana do not and likely will not use MRP to purchase Replacement Shingles for multiple reasons including logistical, practical and business considerations.

62. MRP's pricing does not accurately reflect the market price of shingles in Indiana.

63. Defendant chose to use MRP pricing to determine the market price for Replacement Shingles because MRP's pricing is low and helps reduce the ACV estimate for damages.

64. As previously alleged, Defendant uses Xactimate to estimate damages claims. However, Defendant chose to ignore the recommended pricing from Xactimate when estimating market price of Plaintiff's Replacement Shingles.

65. Xactimate provides the single most accurate market pricing model in the industry. Xactimate uses almost 20,000 surveys each month from over 50,000 suppliers, contractors, and servicers across the continent to estimate market prices. **Exhibit D; p. 2-3.**

66. Defendant's failure to utilize a well-recognized pricing model largely regarded as the industry standard and manipulation of the ACV of Plaintiff's damages is improper and illegal.

67. When Defendant adjusted the Loss, it purposefully used a manipulated and inaccurate RCV for Replacement Shingles to calculate the ACV of the Loss.

68. That act was intentional and done with malice and done in accordance with Defendant's

internal policies.

## III.    CLASS ALEGATIONS

### CLASS 1 - Defendant's Failure to Pay Overhead and Profit

69. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff bring this lawsuit as a class action on behalf of himself and on behalf of all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation. Only to the extent it is a requirement under applicable law, the class is ascertainable.

70. The proposed Overhead and Profit Class that Plaintiff seek to represent is defined as follows:

> All persons and legal entities who were insured under a Liberty Mutual homeowner's policy and where: (1) the insured premises was located in Indiana; (2) the insured premises incurred loss in the two years immediately preceding the filing of this lawsuit; (3) Liberty Mutual determined that the policyholder suffered direct physical loss to the roof of the insured premises and said loss was covered by the terms of the policy; (4) the covered loss at least included the repairs or replacement of gutters and roof shingles; and (5) Liberty Mutual did not pay the policyholder for overhead and profit when it issued a check for the ACV of the loss or anytime thereafter.

71. Plaintiff reserves the right to amend the definition of the proposed Overhead and Profit Class. The following persons are expressly excluded from the Overhead and Profit Class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed class; (3) the Court to which this case is assigned and its staff; (4)

any person or entity whose applicable suit limitation clause expired prior to the filing of the instant action; (5) any policyholder who received the full limits of applicable coverage; (6) Plaintiff's counsel; (7) all person who may otherwise be members of the Overhead and Profit Class but have submitted to an appraisal process under the terms of the Policy; or (8) all persons who have released via a settlement agreement their claims against the Defendant for Overhead and Profit costs.

72. The members of the proposed Overhead and Profit Class are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds if not thousands of people geographically dispersed across Indiana have been damaged by Defendant's actions. The names and addresses of the members of the proposed Overhead and Profit Class are readily identifiable through records maintained by Defendant or from information readily available to the Defendant.

73. The relatively small amounts of damage suffered by most members of the proposed Overhead and Profit Class make filing separate lawsuits economically impracticable.

74. Defendant has acted on grounds generally applicable to the proposed Overhead and Profit Class in that Defendant routinely refuses to pay any Overhead and Profit costs even when the repairs/replacement for the covered loss include utilization of and coordination between at least two different trades including repairs/replacement of roof shingles and gutters. Such conduct warrants Plaintiff's requests for appropriate injunctive and declaratory relief.

75. Common questions of law and fact exist as to all members of the proposed Overhead and Profit Class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed Overhead and Profit Class include, but are not limited to:

    I.    Whether Defendant was required under the terms of the Policy to pay Overhead and

Profit costs when disbursing payments for ACV of a covered loss which included utilization of and coordination between at least two different trades including repairs/replacement of roof shingles and gutters.

II.    Whether Defendant breached its duty under the terms of the Policy when it refused to pay Overhead and Profit costs when disbursing payments for ACV of a covered loss which included utilization of and coordination between at least two different trades including repairs/replacement of roof shingles and gutters.

III.   Whether Plaintiff and members of the proposed Overhead and Profit Class have been damaged as a result of Defendant's withholding of Overhead and Profit costs; and

IV.    Whether Plaintiff and members of the proposed Overhead and Profit Class are entitled to a declaration, as well as potential supplemental relief, under the applicable declaratory judgment laws.

76. Plaintiff's claims are typical of the claims of all proposed Overhead and Profit Class members, as they are all similarly affected by Defendant's customs and practices concerning refusal to pay Overhead and Profit costs when the repairs/replacement for the covered loss include utilization of and coordination between at least two different trades including repairs/replacement of roof shingles and gutters. Further, Plaintiff's claims are typical of the claims of all proposed Overhead and Profit Class members because their claims arise from the same practices and course of conduct that give rise to the claims of the proposed Overhead and Profit Class members and are based on the same factual and legal theories. Plaintiff is not different in any material respect from any other member of the proposed Overhead and Profit Class.

77. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiff's interests do not conflict with the interests of the proposed

13

Overhead and Profit Class he seeks to represent. Plaintiff has retained lawyers who are competent and experienced in class action and insurance litigation. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and his counsel are aware of their fiduciary responsibilities to the Overhead and Profit Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Overhead and Profit Class while recognizing the risks associated with litigation.

78. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed Overhead and Profit Class members in one action is impracticable, and prosecuting individual actions is not feasible. The size of most individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed Overhead and Profit Class, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if proposed Overhead and Profit Class members had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact.

79. In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results, and equal protection of the rights of Plaintiff and members of the proposed Overhead and Profit Class. These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

80. Questions of law or fact common to Plaintiff and the proposed Overhead and Profit Class

14

members, including those identified above, predominate over questions affecting only individual members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow many similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals would require. Further, the monetary amounts due to many individual proposed Overhead and Profit Class members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual proposed Overhead and Profit Class members to seek and obtain relief. On the other hand, a class action will serve important public interests by permitting consumers harmed by Liberty Mutual's unlawful practices to effectively pursue recovery of the sums owed to them and by deterring further unlawful conduct. The public interest in protecting the rights of consumers favors disposition of the controversy in the class action form.

81. Class certification is further warranted because Defendant has acted or refused to act on grounds that apply generally to the Overhead and Profit Class, so final injunctive relief or corresponding declaratory relief is appropriate with respect to the Overhead and Profit Class as a whole.

## **CLASS 2 - Failure to Pay for Ice and Water Shield**

82. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this lawsuit as a class action on behalf of himself and on behalf of all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation. Only to the extent it is a requirement under applicable law, the class is ascertainable.

83. The proposed Ice and Water Shield Class that Plaintiff seeks to represent is defined as follows:

All persons and legal entities insured under a Liberty Mutual homeowner's policy and where: (1) the insured premises was located in Indiana; (2) the insured premises incurred loss in the two years immediately preceding the filing of this lawsuit; (3) Liberty Mutual determined that the policyholder suffered a direct physical loss to the roof of the insured premises and the loss would entitled the policyholder to replace the entire roof under the terms of the policy; and (3) Liberty Mutual did not pay the policyholder for costs of installing the Ice and Water Shield in the Valleys of the roof of the insured premises when it issued a check for the ACV of the loss or anytime thereafter.

84. Plaintiff reserves the right to amend the definition of the proposed Ice and Water Shield Class. The following persons are expressly excluded from the Ice and Water Shield Class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Ice and Water Shield Class; (3) the Court to which this case is assigned and its staff; (4) any person or entity whose applicable suit limitation clause expired prior to the filing of the instant action; (5) any policyholder who received the full limits of applicable coverage; (6) Plaintiff's counsel; (7) all persons who may otherwise be members of the Ice and Water Shield Class but have submitted to an appraisal process under the terms of the Policy; or (8) all persons who have released via a settlement agreement their claims against the Defendant for the cost of Ice and Water Shield installation in the Valleys of the insured premises.

85. The members of the proposed Ice and Water Shield Class are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds if not thousands of

people geographically dispersed across Indiana have been damaged by Defendant's actions. The names and addresses of the members of the proposed Ice and Water Shield Class are readily identifiable through records maintained by Defendant or from information readily available to the Defendant.

86. The relatively small amounts of damage suffered by most members of the proposed Ice and Water Shield Class make filing separate lawsuits economically impracticable.

87. Defendant has acted on grounds generally applicable to the proposed Ice and Water Shield Class in that Defendant routinely refuses to pay for Ice and Water Shield in the Valleys of the roof when issuing a check for ACV until the cost is incurred. Such conduct warrants Plaintiff requests for appropriate injunctive and declaratory relief.

88. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

    I.    Whether Defendant was required under the terms of the Policy to pay Plaintiff and Ice and Water Shield Class member for installation of Ice and Water Shield in the Valleys of the roof.

    II.    Whether Defendant breached the terms of the Policy when it refused to pay Plaintiff and Ice and Water Shield Class members for installation of Ice and Water Shield in the Valleys of the roof.

    III.    Whether Plaintiff and members of the proposed Ice and Water Shield Class have been damaged as a result of Defendant's refusal to pay for the Ice and Water Shield in the Valleys of the roof until said cost was incurred; and

    IV.    Whether Plaintiff and members of the proposed Ice and Water Shield Class are entitled to a declaration, as well as potential supplemental relief, under the applicable

declaratory judgment laws.

89. Plaintiff's claims are typical of the claims of all proposed Ice and Water Shield Class members, as they are all similarly affected by Defendant's customs and practices concerning refusal to pay for the cost of Ice and Water Shield before said costs are incurred. Further, Plaintiff's claims are typical of the claims of all proposed Ice and Water Shield Class members because their claims arise from the same practices and course of conduct that give rise to the claims of the proposed Ice and Water Shield Class members and are based on the same factual and legal theories. Plaintiff is not different in any material respect from any other member of the proposed Ice and Water Shield Class.

90. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the proposed Ice and Water Shield Class. Plaintiff's interests do not conflict with the interests of the proposed Ice and Water Shield Class he seeks to represent. Plaintiff has retained lawyers who are competent and experienced in class action and insurance litigation. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and his counsel are aware of their fiduciary responsibilities to the Ice and Water Shield Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Ice and Water Shield Class while recognizing the risks associated with litigation.

91. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed Ice and Water Shield Class members in one action is impracticable, and prosecuting individual actions is not feasible. The size of most individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed Ice and Water Shield Class, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even

if proposed Ice and Water Shield Class members had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact.

92. In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results, and equal protection of the rights of Plaintiff and members of the proposed Ice and Water Shield Class. These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

93. Questions of law or fact common to Plaintiff and the proposed Ice and Water Shield Class members, including those identified above, predominate over questions affecting only individual members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow many similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals would require. Further, the monetary amounts due to many individual proposed Ice and Water Shield Class members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual proposed Ice and Water Shield Class members to seek and obtain relief. On the other hand, a class action will serve important public interests by permitting consumers harmed by Liberty Mutual's unlawful practices to effectively pursue recovery of the sums owed to them and by deterring further unlawful conduct. The public interest in protecting the rights of consumers favors disposition of the controversy in the class action form.

94. Class certification is further warranted because Defendant has acted or refused to act on grounds that apply generally to the Ice and Water Shield Class, so final injunctive relief or corresponding declaratory relief is appropriate with respect to the Ice and Water Shield Class as a whole.

### CLASS 3 - Defendant's Failure to Pay for Removal Costs

95. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this lawsuit as a class action on behalf of himself and on behalf of all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation. Only to the extent it is a requirement under applicable law, the class is ascertainable.

96. The proposed Removal Costs Class that Plaintiff seek to represent is defined as follows:

> All persons and legal entities who were insured under a Liberty Mutual homeowner's policy and where: (1) the insured premises was located in Indiana; (2) the insured premises incurred loss in the two years immediately preceding the filing of this lawsuit; (3) Liberty Mutual determined that the policyholder suffered direct physical loss to the roof of the insured premises and said loss was covered by the terms of the policy; (4) Liberty Mutual determined that it would pay for replacement of flashing, roof vent, continuous ridge vent, or gable cornice return; and (5) Liberty Mutual did not pay for the dump fees, hauling, disposal and/or labor associated with the removal of existing flashing, roof vent, continuous ridge vent, and gable cornice return when it issued a check for the ACV of the loss or anytime thereafter.

97. Plaintiff reserves the right to amend the definition of the proposed Removal Cost Class. The following persons are expressly excluded from the Removal Cost Class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed class; (3) the Court to which this case is assigned and its staff; (4) any person or entity whose applicable suit limitation clause expired prior to the filing of the instant action; (5) any policyholder who received the full limits of applicable coverage; (6) Plaintiff's counsel; (7) all person who may otherwise be members of the Removal Cost Class but have submitted to an appraisal process under the terms of the Policy; or (8) all persons who have released via a settlement agreement their claims against the Defendant for the cost of dump fees, hauling, disposal and/or labor associated with the removal of existing flashing, roof vent, continuous ridge vent, and gable cornice return .

98. The members of the proposed Removal Costs Class are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds if not thousands of people geographically dispersed across Indiana have been damaged by Defendant's actions. The names and addresses of the members of the proposed Removal Cost Class are readily identifiable through records maintained by Defendant or from information readily available to the Defendant.

99. The relatively small amounts of damage suffered by most members of the proposed Removal Cost Class make filing separate lawsuits economically impracticable.

100.   Defendant has acted on grounds generally applicable to the proposed Removal Cost Class in that Defendant routinely refuses to pay costs for dump fees, hauling, disposal and/or labor associated with the removal of existing Flashing, Roof Vent, Continuous Ridge Vent, and Gable Cornice. Such conduct warrants Plaintiff requests for appropriate injunctive and declaratory relief.

101.    Common questions of law and fact exist as to all members of the proposed Removal Cost Class and predominates over any questions affecting only individual members. The questions of law and fact common to the proposed Removal Cost Class include, but are not limited to:

   I.    Whether Defendant were required under the terms of the Policy to pay dump fees, hauling, disposal and/or labor associated with the removal of existing Flashing, Roof Vent, Continuous Ridge Vent when disbursing payments for ACV of a covered loss.

   II.    Whether Defendant breached its duty under the terms of the Policy when it refused to pay dump fees, hauling, disposal and/or labor associated with the removal of existing flashing, roof vent, continuous ridge vent, and gable cornice when disbursing payments for ACV of a covered loss.

   III.    Whether Defendant's Policy language is ambiguous concerning the payment of dump fees, hauling, disposal and/or labor associated with the removal of existing flashing, roof vent, continuous ridge vent, and gable cornice when disbursing payments for ACV of a covered loss.

   IV.    Whether Plaintiff and members of the proposed Removal Costs Class have been damaged as a result of Defendant's withholding payment for dump fees, hauling, disposal and/or labor associated with the removal of existing flashing, roof vent, continuous ridge vent, and gable cornice when disbursing payments for ACV of a covered loss.

   V.    Whether Plaintiff and members of the proposed Removal Costs Class are entitled to a declaration, as well as potential supplemental relief, under the applicable declaratory judgment laws; and

102.    Plaintiff's claims are typical of the claims of all proposed Removal Costs Class members, as they are all similarly affected by Defendant's customs and practices concerning refusal to

pay for to pay dump fees, hauling, disposal and/or labor associated with the removal of existing Flashing, Roof Vent, Continuous Ridge Vent when disbursing payments for ACV of a covered loss. Further, Plaintiff's claims are typical of the claims of all proposed Removal Costs Class members because their claims arise from the same practices and course of conduct that give rise to the claims of the proposed Removal Costs Class members and are based on the same factual and legal theories. Plaintiff is not different in any material respect from any other member of the proposed Removal Costs Class.

103.    Plaintiff and his counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiff's interests do not conflict with the interests of the proposed Removal Costs Class they seek to represent. Plaintiff has retained lawyers who are competent and experienced in class action and insurance litigation. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and his counsel are aware of their fiduciary responsibilities to the Removal Costs Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Removal Costs Class while recognizing the risks associated with litigation.

104.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed Removal Costs Class members in one action is impracticable, and prosecuting individual actions is not feasible. The size of most individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed Removal Costs Class, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if proposed Removal Costs Class members had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such cases would

proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact.

105.    In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results, and equal protection of the rights of Plaintiff and members of the proposed Removal Costs Class. These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

106.    Questions of law or fact common to Plaintiff and the proposed Removal Costs Class members, including those identified above, predominate over questions affecting only individual members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow many similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals would require. Further, the monetary amounts due to many individual proposed Removal Costs Class members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual proposed Removal Costs Class members to seek and obtain relief. On the other hand, a class action will serve important public interests by permitting consumers harmed by Liberty Mutual's unlawful practices to effectively pursue recovery of the sums owed to them and by deterring further unlawful conduct. The public interest in protecting the rights of consumers favors disposition of the controversy in the class action form.

107.    Class certification is further warranted because Defendant has acted or refused to act on grounds that apply generally to the Removal Costs Class, so final injunctive relief or

corresponding declaratory relief is appropriate with respect to the Removal Costs Class as a whole.

### CLASS 4 - Failure to Pay for Starter Strip

108.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff bring this lawsuit as a class action on behalf of himself and on behalf of all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation. Only to the extent it is a requirement under applicable law, the class is ascertainable.

109.    The proposed Starter Strip Class that Plaintiff seeks to represent is defined as follows:

> All persons and legal entities insured under a Liberty Mutual homeowner's policy and where: (1) the insured premises was located in Indiana; (2) the insured premises incurred loss in the two years immediately preceding the filing of this lawsuit; (3) Liberty Mutual determined that the policyholder suffered a direct physical loss to the roof of the insured premises and said loss was covered by the terms of the Policy; and (3) Liberty Mutual did not pay the policyholder for cost of Starter Strip when it issued a check for the ACV of the loss or anytime thereafter.

110.    Plaintiff reserves the right to amend the definition of the proposed Starter Strip Class. The following persons are expressly excluded from the Starter Strip Class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Starter Strip Class; (3) the Court to which this case is assigned and its staff; (4) any person or entity whose applicable suit limitation clause expired prior to the filing of the instant action; (5) any policyholder who received the full limits of applicable coverage; (6) Plaintiff's

counsel; (7) all persons who may otherwise be members of the Starter Strip Class but have submitted to an appraisal process under the terms of the Policy; or (8) all persons who have released via a settlement agreement their claims against the Defendant for the cost of a Starter Strip installation in the Valleys of the insured premises.

111.    The members of the proposed Starter Strip Class are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds if not thousands of people geographically dispersed across Indiana have been damaged by Defendant's actions. The names and addresses of the members of the proposed Starter Strip Class are readily identifiable through records maintained by Defendant or from information readily available to the Defendant.

112.    The relatively small amounts of damage suffered by most members of the proposed Starter Strip Class make filing separate lawsuits economically impracticable.

113.    Defendant has acted on grounds generally applicable to the proposed Starter Strip Class in that Defendant routinely refuses to pay for Starter Strip when issuing a check for ACV. Such conduct warrants Plaintiff requests for appropriate injunctive and declaratory relief.

114.    Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

    I.    Whether Defendant was required under the terms of the Policy to pay Plaintiff and Starter Strip Class members for the cost of the Starter Strip.

    II.    Whether Defendant breached the terms of the Policy when it refused to pay Plaintiff and Starter Strip Class Members for the Starter Strip.

    III.    Whether Plaintiff and members of the proposed Starter Strip Class have been damaged as a result of Defendant's refusal to pay for the Starter Strip; and

IV.   Whether Plaintiff and members of the proposed Starter Strip Class are entitled to a declaration, as well as potential supplemental relief, under the applicable declaratory judgment laws.

115.   Plaintiff's claims are typical of the claims of all proposed Starter Strip Class members, as they are all similarly affected by Defendant's customs and practices concerning refusal to pay for the cost of Starter Strip. Further, Plaintiff's claims are typical of the claims of all proposed Starter Strip Class members because their claims arise from the same practices and course of conduct that give rise to the claims of the proposed Starter Strip Class members and are based on the same factual and legal theories. Plaintiff is not different in any material respect from any other member of the proposed Starter Strip Class.

116.   Plaintiff and his counsel will fairly and adequately protect the interests of the members of the proposed Starter Strip Class. Plaintiff's interests do not conflict with the interests of the proposed Starter Strip Class they seek to represent. Plaintiff has retained lawyers who are competent and experienced in class action and insurance litigation. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and his counsel are aware of their fiduciary responsibilities to the Starter Strip Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Starter Strip Class while recognizing the risks associated with litigation.

117.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed Starter Strip Class members in one action is impracticable, and prosecuting individual actions is not feasible. The size of most individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed Starter Strip Class, a class action is the only procedural

mechanism that will afford them an opportunity for legal redress and justice. Even if proposed Starter Strip Class members had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact.

118.    In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results, and equal protection of the rights of Plaintiff and members of the proposed Starter Strip Class. These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

119.    Questions of law or fact common to Plaintiff and the proposed Starter Strip Class members, including those identified above, predominate over questions affecting only individual members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow many similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals would require. Further, the monetary amounts due to many individual proposed Starter Strip Class members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual proposed Starter Strip Class members to seek and obtain relief. On the other hand, a class action will serve important public interests by permitting consumers harmed by Liberty Mutual's unlawful practices to effectively pursue recovery of the sums owed to them and by deterring further unlawful conduct. The public interest in protecting the rights of consumers favors disposition of

the controversy in the class action form.

120. Class certification is further warranted because Defendant has acted or refused to act on grounds that apply generally to the Starter Strip Class, so final injunctive relief or corresponding declaratory relief is appropriate with respect to the Starter Strip Class as a whole.

## CLASS 5 – Replacement Shingles Costs Class

121. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff bring this lawsuit as a class action on behalf of himself and on behalf of all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation. Only to the extent it is a requirement under applicable law, the class is ascertainable.

122. The proposed Replacement Shingle Cost Class that Plaintiff seeks to represent is defined as follows:

> All persons and legal entities insured under a Liberty Mutual homeowner's policy and where: (1) the insured premises was located in Indiana; (2) the insured premises incurred loss in the two years immediately preceding the filing of this lawsuit; (3) Liberty Mutual determined that the policyholder suffered a direct physical loss to the roof of the insured premises and said loss was covered by the terms of the Policy; (3) Liberty Mutual paid the policyholders for the ACV of shingles damaged on the insured premises based upon pricing provided by MRP; and (4) the ACV calculated and paid by Liberty Mutual to the policyholder was lower than the ACV recommended by Xactimate

123.    Plaintiff reserves the right to amend the definition of the proposed Replacement Shingle Cost Class. The following persons are expressly excluded from the Replacement Shingle Cost Class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Replacement Shingle Cost Class; (3) the Court to which this case is assigned and its staff; (4) any person or entity whose applicable suit limitation clause expired prior to the filing of the instant action; (5) any policyholder who received the full limits of applicable coverage; (6) Plaintiff's counsel; (7) all person who may otherwise be members of the Replacement Shingle Cost Class but have submitted to an appraisal process under the terms of the Policy; or (8) all persons who have released via a settlement agreement their claims against the Defendant for using reduced pricing from MRP to calculate the ACV of the damaged shingles.

124.    The members of the proposed Replacement Shingle Cost Class are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds if not thousands of people geographically dispersed across Indiana have been damaged by Defendant's actions. The names and addresses of the members of the proposed Replacement Shingle Cost Class are readily identifiable through records maintained by Defendant or from information readily available to the Defendant.

125.    The relatively small amounts of damage suffered by most members of the proposed Replacement Shingle Cost Class make filing separate lawsuits economically impracticable.

126.    Defendant has acted on grounds generally applicable to the proposed Replacement Shingle Cost Class in that Defendant routinely using reduced pricing information from MRP to determine the ACV of shingles when such pricing was lower than the pricing provided by Xactimate based upon extensive market surveys. Such conduct warrants Plaintiff requests for appropriate injunctive and declaratory relief.

127.   Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

   I.   Whether the ACV of the damaged shingles paid to the Replacement Shingle Class members was lower than what the Replacement Shingle Class members were entitled to under the terms of the Policy.

   II.   Whether Defendant breached the terms of the Policy in paying the Replacement Shingle Class members an ACV of the damaged shingles which was lower than what the Replacement Shingle Class members were entitled to under the terms of the Policy.

   III.   Whether Plaintiff and members of the proposed Replacement Shingles Cost Class have been damaged as a result of Defendant's illegal conduct; and

   IV.   Whether Plaintiff and members of the proposed Replacement Shingles Cost Class are entitled to a declaration, as well as potential supplemental relief, under the applicable declaratory judgment laws.

128.   Plaintiff's claims are typical of the claims of all proposed Replacement Shingle Cost Class members, as they are all similarly affected by Defendant's customs and practices concerning Defendant's use of reduced pricing from MRP to calculate the ACV of the shingles. Further, Plaintiff's claims are typical of the claims of all proposed Replacement Shingle Cost Class members because their claims arise from the same practices and course of conduct that give rise to the claims of the proposed Replacement Shingle Cost Class members and are based on the same factual and legal theories. Plaintiff is not different in any material respect from any other member of the proposed Replacement Shingle Cost Class.

129.   Plaintiff and his counsel will fairly and adequately protect the interests of the members

of the proposed Replacement Shingle Cost Class. Plaintiff's interests do not conflict with the interests of the proposed Replacement Shingle Cost Class they seek to represent. Plaintiff has retained lawyers who are competent and experienced in class action and insurance litigation. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and his counsel are aware of their fiduciary responsibilities to the Replacement Shingle Cost Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Replacement Shingle Cost Class while recognizing the risks associated with litigation.

130. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed Replacement Shingle Cost Class members in one action is impracticable, and prosecuting individual actions is not feasible. The size of most individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed Replacement Shingle Cost Class, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if proposed Replacement Shingle Cost Class members had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact.

131. In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results, and equal protection of the rights of Plaintiff and members of the proposed Replacement Shingle Cost Class. These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

132.    Questions of law or fact common to Plaintiff and the proposed Replacement Shingle Cost Class members, including those identified above, predominate over questions affecting only individual members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow many similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals would require. Further, the monetary amounts due to many individual proposed Replacement Shingle Cost Class members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual proposed Replacement Shingle Cost Class members to seek and obtain relief. On the other hand, a class action will serve important public interests by permitting consumers harmed by Liberty Mutual's unlawful practices to effectively pursue recovery of the sums owed to them and by deterring further unlawful conduct. The public interest in protecting the rights of consumers favors disposition of the controversy in the class action form.

133.    Class certification is further warranted because Defendant has acted or refused to act on grounds that apply generally to the Replacement Shingle Cost Class, so final injunctive relief or corresponding declaratory relief is appropriate with respect to the Replacement Shingle Cost Class as a whole.

## IV.    LEGAL ALLEGATIONS

### COUNT I BREACH OF CONTRACT

134.    Plaintiff restates and incorporates by reference all preceding allegations.

135.    Defendant entered into policies of insurance with Plaintiff and members of the proposed Classes. These insurance policies govern the relationship between Liberty Mutual, Plaintiff, and members of the proposed Classes, as well as the manner in which claims for covered

losses are handled and paid.

136.    The policies of insurance between Liberty Mutual and Plaintiff and the other proposed

Class members are binding contracts under state law supported by valid consideration in the

form of premium payments in exchange for insurance coverage.

137.    Liberty Mutual drafted the insurance policies at issue, which are essentially identical in all

respects material to this litigation.

138.    Plaintiff and the proposed Class members complied with all material provisions and

performed all their respective duties regarding their insurance policies.

139.    Liberty Mutual breached the terms of the homeowner policies when it failed to take the

following actions in compliance with the terms of the homeowner policies:

I.    Defendant failed to include the ACV for Overhead and Profit costs when calculating and

issuing ACV payments to the Overhead and Profit Class members;

II.    Defendant failed to include the ACV for installing Ice and Water Shield in the Valleys of

roofs when calculating and issuing ACV payments to the Ice and Water Shield Class

members;

III.    Defendant failed to include the cost for dumping, hauling, disposal and/or labor

associated with the removal of existing flashing, roof vent, continuous ridge vent, and

gable cornice return costs when calculating and issuing ACV payments to the Removal

Cost Class members;

IV.    Defendant failed to include the cost of Starter Strip when calculating and issuing the

ACV payments to the Starter Strip Class members; and

V.    Defendant failed to pay the Replacement Shingles Class members the ACV for the

damaged shingles which they were entitled to under the terms of the homeowner policies.

Liberty Mutual paid the policyholder the ACV for the shingles based upon MRP pricing

and ignored the ACV recommended by Xactimate.

140.    Liberty Mutual's actions in breaching its contractual obligations to Plaintiff and members of the proposed Classes benefitted and continue to benefit Liberty Mutual. Likewise, Liberty Mutual's actions damaged and continue to damage Plaintiff and members of the proposed Classes.

141.    Liberty Mutual's actions in breaching its contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiff and members of the proposed Classes.

142.    In light of the foregoing, Plaintiff and members of the proposed Classes are entitled to recover all damages and relief just and proper.

## V.    JURY DEMAND

Plaintiff hereby demand a trial by jury on their claims.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully request that this Court:

1.    Enter an order certifying this action as a class action, appointing Plaintiff as the representatives of the class, and appointing Saeed & Little, LLP as counsel for the Classes;

2.    Enter a declaratory judgment, declaring that Liberty Mutual' s failure conduct described in this Complaint breaches the insurance policies issued to Plaintiff and members of the Classes;

3.    Award to Plaintiff and members of the Classes: consequential damages resulting from Defendant's breach of contract; compensatory damages for all sums improperly withheld, plus prejudgment interest on all such sums;

4.      Grant such further and additional relief as the Court deems necessary and proper.

Respectfully submitted,

By: /s/ Syed Ali Saeed
Syed Ali Saeed, No. 28759-49
Saeed & Little, LLP
133 West Market St, #189
Indianapolis, IN 46204