# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| WILLIAM BEYERS individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:19-cv-01601-TWP-DLP |
| CONSOLIDATED INSURANCE COMPANY, and LIBERTY MUTUAL AGENCY CORP, | ) ) ) |
| Defendants. | ) ) |

## ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RESOLVING OTHER PENDING MOTIONS

This matter is before the Court on numerous motions filed by both Plaintiff William Beyers ("Beyers") and Defendants Consolidated Insurance Company ("Consolidated") and Liberty Mutual Agency Corp. ("Liberty Mutual") (collectively the "Defendants"). After a hailstorm damaged his home, Beyers sued the Defendants for breach of contract alleging they insufficiently paid out his damage claim.  He brings this action on behalf of himself, as well as others similarly situated.  Before the Court is the Defendants' Motion for Summary Judgment (Filing No. 91), Defendants' Motion *in Limine* to Strike Plaintiff's Expert Witness Randal Adkins (Filing No. 107), Defendants' Motion *in Limine* to Strike Plaintiff's Expert Witness Aaron Poland (Filing No. 109), and Beyers' Motion for Class Certification (Filing No. 111), as well as other related motions.  For the following reasons, the Court **grants** Defendants' Motions *in Limine* regarding Defendants' expert witnesses, **grants** Defendants' Motion for Summary Judgment, **denies** Beyers' Motion for Class Certification, and **resolves** all other motions as discussed throughout this Entry and as specifically detailed in the Conclusion section.

# I.    **BACKGROUND**

A hailstorm damaged Beyers' Carmel, Indiana home on April 26, 2017 (Filing No. 91-2 at 1).  On August 30, 2017, Beyers filed a claim with Consolidated, his insurer, for the damage.  *Id.* After determining that the home required new shingles and vents on the roof, as well as replacement of some gutters, downspouts, and window screens, Consolidated paid Beyers $11,585.96 for the unrepaired damage on September 7, 2017.  *Id.* at 3–8.  This amount was adjudged the actual cash value for the loss, tracking the policy's provision that Consolidated would pay "no more than the actual cash value of the damage until actual repair or replacement is complete." (Filing No. 91-3 at 16.)  If Beyers repaired the damage, certain of the depreciation was recoverable by him.  *Id.* Consolidated also compensated Beyers to replace some gutters and downspouts. (Filing No. 91-2 at 3, 4–5.)  In calculating the amount owed to Beyers, Consolidated determined that a general contractor was unnecessary to complete the repairs.  *See generally id.* at 8.  And to ascertain the shingle replacement cost, Consolidated relied on pricing verified by the MRP Managed Material Program ("MRP").  *Id.* at 4.  Under this program, insureds or their contractors can purchase shingles directly from suppliers nationwide at contractor or discounted rates, and deliver the shingles to the site. (Filing No. 91-6 at 5).

After receiving the $11,585.96 payment, Beyers never disputed or inquired about this recompense and, indeed, never contacted Consolidated about the claim at all (Filing No. 91-4 at 4). Further, Beyers never repaired any of the damage to his roof or gutters himself and never hired a contractor or anyone inspect or repair any of the damage.  *Id.* at 2.  He did speak with a public adjuster, Poland, but Poland never looked at the house.

On April 22, 2019,  Beyers individually, and on behalf of a class of all others similarly situated, sued Defendants for breach of contract on four grounds, alleging that

1.      Defendants also owed payment for general contractor overhead and profit ("GCOP"),

2.      Defendants did not account for the removal of flashing, vents, and gable cornice returns in the estimate,

3.      Defendants failed to pay for the cost of a "starter course" of shingles, and

4.      by using the MRP program, Defendants did not pay him the market price of replacement shingles in Indiana.

(*see generally* [Filing No. 74 at 28](#)–29).  Eventually, Defendants moved for summary judgment and Beyers moved for class certification. The Court will discuss these Motions along with the relevant ancillary motions as they become germane.

## II.      DISCUSSION

### A.      Defendants' Motions *in Limine* to Strike Beyers' Expert Witnesses

As an initial matter, the Court will address the Defendants' Motions *in Limine* to strike two of Beyers' expert witnesses: Randal Adkins ("Adkins") and Aaron Poland ("Poland") (*see* [Filing No. 107](#); [Filing No. 109](#)).  Because these expert witnesses provide support for Beyers on summary judgment and class certification (*see, e.g.*, [Filing No. 130](#) *passim* (summary judgment); [Filing No. 112](#) *passim* (class certification)), the Court will first discuss these motions to determine whether their opinions should be excluded, and their testimony and reports stricken.

### 1.      Legal Standard

"[J]udges have broad discretion in ruling on evidentiary questions during trial or before on motions *in limine*." *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002).  The court excludes evidence on a motion *in limine* only if the evidence clearly is not admissible for any purposes.  *See Hawthorne Partners v. AT&T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993).  Unless evidence meets this exacting standard, evidentiary rulings must be deferred until trial so questions of foundation, relevancy, and prejudice may be resolved in context.

*Id.* at 1400–01.  Moreover, denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion is admissible; rather, it only means that, at the pretrial stage, the court is unable to determine whether the evidence should be excluded.  *Id.* at 1401.

Federal Rule of Evidence 702 governs testimony of expert witnesses.  An expert may testify regarding the ultimate issue in a case.  Fed. R. Evid. 704(a).  Furthermore, an expert can base his opinion on inadmissible evidence.  Fed. R. Evid. 703.  However, "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."  *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

"Under the *Daubert* gatekeeping requirement, the district court has a duty to ensure that expert testimony offered under Federal Rule of Evidence 702 is both relevant and reliable."  *Jenkins v. Bartlett*, 487 F.3d 482, 488–89 (7th Cir. 2007) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).  "Whether proposed expert testimony is sufficiently reliable under Rule 702 is dependent upon the facts and circumstances of the particular case."  *Id.* at 489.  The court is given "latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable."  *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citing *Jenkins*, 487 F.3d at 489).

"In determining reliability, *Daubert* sets forth the following non-exhaustive list of guideposts: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the scientific community."  *Id.* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)).  "The court should also consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion."  *Id.*

4

> Since the gatekeeping inquiry must be tied to the facts of the particular case, . . . a trial court may - but is not required to - consider "one or more of the more specific factors that *Daubert* mentioned when doing so will help determine the testimony's reliability." But, the [Supreme] Court stressed, those factors, which were meant "to be helpful, not definitive," "neither necessarily nor exclusively apply to all experts or in every case." Their applicability will depend on "'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" The procedure employed will depend largely on the "particular circumstances of the particular case at issue."

*Richman v. Sheahan*, 415 F. Supp. 2d 929, 934 (N.D. Ill. 2006) (quoting *Kumho Tire*, 526 U.S. at 142, 150, 152).

Additionally, the district court must determine whether the proposed expert testimony will assist the trier of fact in determining a fact in issue or understanding the evidence. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). "Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616.

> Vigorous cross examination, presentation of contrary evidence and careful jury instructions . . . are the traditional and appropriate means of attacking shaky but admissible evidence. The rejection of expert testimony is the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.

*Richman*, 415 F. Supp. 2d at 933 (citations and quotation marks omitted).  All told, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

### 2.     Defendants' Motion *in Limine* to Strike Adkins

Adkins is the founder and part owner of Rocklane Company General Contractors, LLC, one of the largest residential roof repair general contractors in central Indiana. (Filing No. 108-2 at 1). For over three decades he has been involved in thousands of roof repair/replacement projects in Indiana. *Id*. at 1-2. Adkins has not testified as an expert witness in an litigation in the past ten years. *Id*. Beyers offers Adkins as a purported expert witness to testify in support of class certification regarding: (1) the steps to perform a shingles and gutter repair/replacement project and the standard for determining where general contractor overhead and profit is appropriate to complete the same; (2) the necessity of a starter strip and the proper method to calculate the cost for the same; and (3) the factors considered in selecting a shingles supplier. *Id*. at 2-5. Defendants move to strike Adkins' expert opinions in each of these areas. (*see* Filing No. 107 at 1). The Court will discuss each of these contentions in turn.

### a.     General Contractor Overhead And Profit (GCOP)

Defendants contend that Adkins' opinion regarding inclusion of GCOP for shingles and gutter repair/replacement jobs is both unreliable and irrelevant. (Filing No. 108 at 9.) They assert that Adkins' opinion "is not reliable because it has not been tested or subjected to peer review, nor accepted by either the construction or insurance industry." *Id*. at 10. And it is unreliable "because acquiring and completing a shingles and gutter repair/replacement project requires back-office support staff, advertising, a sales team, and legal services, contractors are entitled to GCOP." *Id*. at 9. Generally, Defendants argue, courts "hold that opinions not subjected to testing or peer review are speculative and thus inadmissible." *Id*. at 10 (citing *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010)). Because "Adkins admits that his opinions—including his opinion regarding GCOP—have not been tested . . . , the Court should exclude Adkins' opinion regarding

the standard for whether GCOP should be included in a shingles and gutter repair/replacement estimate." *Id.* at 11.

Moreover, Defendants argue, "it is improper for Adkins to opine that paying GCOP for all shingles and gutter projects is an accepted standard among contractors" when "[a] true standard derives from well-recognized principles, not from the belief or practice of a single contractor". *Id.* Moreover, Defendants argue, this opinion is not based on established standard, but instead flows from Adkins' "subjective and self-serving belief that GCOP should be included in every estimate". *Id.* at 11–12.  Contrary to this belief, "most courts hold that the cost to perform a repair should include GCOP *only* when the services of a general contractor are reasonably necessary." *Id.* at 12 (emphasis in original) (citing *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1306 (11th Cir. 2008); *Parkway Assoc. LLC v. Harleysville Mut. Ins. Co.*, 129 Fed. Appx. 955 (6th Cir. 2005); *Gilderman v. State Farm Ins. Co.*, 649 A.2d 941, 945 (Pa. Super. Ct. 1994)).  In fact, Defendants contend, courts have routinely held, and industry trade publications support, "that the services of a general contractor are reasonably necessary *only* when a job is complex or requires coordination between several trades." *Id.* at 12 (emphasis in original; citations omitted).  In contrast, "Adkins opines that GCOP should be paid on *all* roof and gutter projects—regardless of whether the job is complex or simple, and regardless of whether it requires coordination among trades on the jobsite". *Id.* at 13 (emphasis in original).

Finally, Defendants contend that Adkins fails to acknowledge "that because [Beyers'] claim included only shingles and gutter work, these costs are included in what Consolidated already paid [Beyers]; adding GCOP would pay [Beyers] twice." *Id.* at 14–15.  Specifically, the estimate used by Consolidated included "Job Personnel Overhead (or Sub-Contractor O&P) expenses," which accounts for any "overhead expenses and profit of a contractor replacing or repairing shingles or

gutters." *Id.* at 15 (citation omitted). Because Adkins admits he is not an expert in interpreting "each line item" in the software used to create this estimate, his opinion as to any estimate is "unreliable and irrelevant." *Id.* at 16. Defendants assert that "[b]ecause Adkins' opinion is based on a flawed assumption . . . [and] creates confusion over whether [Beyers] … even incurred injury, . . . his opinion should be excluded." *Id.*

In response, Beyers argues that Adkins' opinion: "GCOP should be included for all Gutter and Shingle Replacement Projects in Indiana because such projects are almost always serviced by general contractors." (Filing No. 124 at 4.) These general contractors organize "phone calls" and "meetings," schedule "delivery and return of samples," coordinate work between subcontractors ("ex: gutter specialists and roofers"), create "estimates and submit claims to insurance companies," manage permitting and setting up "meetings with city inspectors," and arrange "payment delivery between insurance carrier, and mortgage company and the homeowner." *Id.* "Without a general contractor," Adkins contends, "homeowners would have to undertake all these tasks themselves as sub-contractors in Indiana do not maintain a back-office support staff and are unable to provide the above referenced services." *Id.* Moreover, subcontractors lack capacity to advertise, pay for legal services "to draw up consumer service agreements," maintain "relationships with materials suppliers," afford "to front the expense of purchasing materials," or "stay current with developing code requirements." *Id.* at 5. Because of these reasons, "Indiana insured are reasonably likely to incur the cost of hiring a general contractor for Gutter and Shingle Repair Projects". *Id.*

Beyers contends that "Defendants['] demands for exclusion of Mr. Adkins' opinions related to payment of GCOP due to lack of peer review or testing are misguided." *Id.* at 6. Instead of a rigid demand for peer review, courts have permitted expert opinion based on "personal knowledge or experience." *Id.* The opinions here—based on Adkins' "personal knowledge and extensive

experience", "are non-scientific in nature and unlikely to be subjected to peer review or measured against specific scientific standards", so the standard Defendants seek to impose should not apply when *Daubert* created a "flexible test for reliability." *Id.* at 7.

Beyers argues that Adkins' opinions "do not run [a]foul of any existing legal standards." *Id.* at 7–8. Indeed, his opinions agree with the premise "that GCOP should only be included when 'the services of a general contractor are reasonably necessary'" because he contends that recipients of gutter and shingle replacement projects "will reasonably expect to hire a general contractor since the local market is largely dominated by them." *Id.* at 8. Moreover, Defendants' attempt to "infus[e] a coordination and complexity requirement . . . is a self-serving and fabricated requirement not mandated under any law or legal standard." *Id.* In fact, imposing this *rigid* standard "would run contrary to the actual legal standard Parties agree upon . . . that GCOP should be paid where a general contractor *is reasonably necessary*." *Id.* at 8-9 (emphasis added).

Beyers additionally contends—as for Defendants' argument "that some if not all of the alleged unpaid GCOP was already included" in payment—that "only a separate line item for GCOP would effectively include the cost of hiring a general contractor and the overhead costs referenced in Mr. Adkins Disclosures." *Id.* at 10–11. This is because the costs of using a general contractor is typically added to an estimate "as a percentage of the total bid in two separate line items for General Contractor's Overhead and General Contractor's Profits." *Id.* at 10 (citations omitted). "At best," Beyers argues, "the facts here are dispute[d] and fail to raise any reliability or relevancy concerns under *Daubert*." *Id.* at 11.

In reply, Defendants again contend that Adkins' GCOP opinion "is not relevant to determining Consolidated's liability." (Filing No. 128 at 1.) Because "Consolidated is only obligated to pay [Beyers] (and his purported class members) the costs reasonably likely to be

9

incurred in repairing a covered loss . . . , the only issue is whether [Beyers] and his purported class members were paid the reasonably estimated costs to repair their homes." *Id.* at 2. Since "[t]he answer to this question turns on the policy language and, if necessary, Consolidated's claims handling practices", Beyers' testimony on "custom and practice . . . misses the point." *Id.*

Moreover, Defendants argue, even though knowledge and experience can certainly support an expert's qualifications, "Adkins' 'knowledge and experience' relates to roofing repairs—not insurance industry practices." *Id.* at 3. Indeed, a Magistrate Judge of this Court has previously "excluded Adkins' opinions regarding insurance claims adjusting practices," while still allowing him to opine on building codes and scope of repairs. *Id.* at 4 (citing *Rocklane Co., LLC v. Travelers Cas. Ins. Co.*, 2020 WL 1320963, at *6–7 (S.D. Ind. Jan. 21, 2020)). Like in *Rocklane*, Defendants argue, "Adkins' GCOP Opinion does not relate to the cause of roof damage or scope of repairs." *Id.*

Defendants argue that "Adkins' opinion that GCOP should be paid for all roofing projects that include at least 'gutter and shingle' repairs . . . is … completely unsupported by objective evidence." *Id.* Indeed, "other than Adkins' say-so, neither Adkins nor [Beyers] has pointed to any evidence of such an 'industry standard.'" *Id.* at 5. "Courts in this jurisdiction agree," Defendants note, "that opinions based on the . . . mere 'say so' of a purported expert are unreliable and should be excluded." *Id.* (citations omitted). And instead of forcefully grafting a "coordination" or "complexity" requirement, "Consolidated's guidelines merely instruct its adjusters to consider the complexity of a repair and amount of coordination required" in order to determine "whether the services of a general contractor are reasonably necessary and thus whether payment for GCOP is warranted." *Id.* at 6.

Finally, any "assertion that Consolidated's GCOP practices contradict legal standards is wrong": "GCOP is warranted only when the services of a general contractor are needed," which includes "consideration of the complexity of repairs and coordination among trades to complete the repairs". *Id.* (citations omitted).

The Court is persuaded that Adkins' GCOP opinion is unreliable and should be excluded: industry practices contradict his assertion that GCOP is owed on every gutter and shingle repair job (*see* Filing No. 110-12 at 4 ("The nature and extent of the damage and the number of trades needed to make repairs are key factors in determining whether use of a general contractor is reasonably likely."); Filing No. 110-14 at 2 ("General Overhead are expense incurred by a General Contractor[] that cannot be attributed to individual projects . . . ."). When an expert's "central underlying premise . . . [is] not only unsupported, but in fact contrary to [the] generally accepted [standard]," a court should exclude his opinion. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 784 (7th Cir. 2017).

**b.**   <u>**Starter Strips**</u>

A starter strip is an asphalt-based shingle placed on the first row of the edges of a roof, on top of which another row of shingles is installed, in order to completely cover the roof deck so that there is no uncovered space between shingle tabs. (Filing No. 91-5 at 11.) Defendants argue that Adkins' "opinions regarding starter strips have not been subjected to any testing and thus are inherently unreliable." (Filing No. 108 at 16.) Specifically, they assert that Adkins "opinion that the cost of starter strips is paid only if listed as a separate line item in an estimate is based upon unreliable methodology and incorrect factual assumption." *Id.* at 17. Instead, the estimate includes "the cost of starter shingles within a waste percentage added to the total replacement shingles needed." *Id.* Defendants contend the methodology behind Adkins' opinion is "contradicted by the

evidence in the case," so it should be excluded as unreliable. *Id.* Further, Defendants argue, though "Adkins opines that a starter strip is necessary for proper shingles installation," the actual issue is whether the payment received by Beyers "included the cost of a starter strip." *Id.* at 18. Because Adkins does not address this pertinent question, his opinion should be excluded as irrelevant. *Id.* (citations omitted). Finally, "Adkins testified that he does not know whether the amount paid to [Beyers] for a starter row was a reasonable estimate" for starter strips and admitted "that a determination of whether payment to any purported class member was sufficient to pay the cost of a starter row requires analysis of each individual claim file." *Id.* at 19.

In response, Beyers argues that "Adkins' opinions related to the use of Starter Strip are both reliable and relevant." (Filing No. 124 at 11.) Like his opinions on GCOP, Adkins' opinions on starter strips are based on his "personal knowledge and extensive experience," which, precedentially, serve as "sufficiently reliable bas[e]s for an expert opinion." *Id.* Further, Adkins never opined "that starter strip costs are only paid if listed as a separate line item"; instead, an insurer may also include the cost of a starter strip by "including such costs into its waste factor." *Id.* at 12. Finally, Adkins' "methodology for calculating starter strip costs helps map out a feasible and manageable plan for damages calculations for individual class members," making it a relevant matter of opinion. *Id.*

In reply, Defendants contend that "none of [Adkins'] opinions is relevant to determining Consolidated's liability." (Filing No. 128 at 7.) The issue, Defendants argue, "is whether Consolidated breached [Beyers'] insurance policy by failing to pay [Beyers] the reasonable costs to repair his roof by including the cost of a starter strip". *Id.* at 8. For his part, Adkins admitted that (1) "the cost for a Starter Strip can be included in the estimate as either a separate line item or as part of the waste factor", (2) "he is unsure about whether the waste factor on [Beyers'] estimate

included the cost for Starter Strip", and (3) "determination of this issue requires a claim-by-claim review." *Id.* Simply put, "Adkins' Starter Strip Opinions are irrelevant to proving Plaintiff's breach of contract claim." *Id.*

The Court finds that Adkins' opinion on starter strips is unreliable because it "failed to address evidence directly contradictory to his opinion." *Bull v. Bd. of Trustees of Ball State Univ.*, No. 110-cv-878-JMS-TAB, 2012 WL 13028936, at *10 (S.D. Ind. May 2, 2012). Specifically, the estimate upon which Beyers' claim is based included a "12% waste factor *to include starter*". ([Filing No. 108-5 at 4](#) (emphasis added).) This cuts directly against Adkins' contention that the cost of a starter course is paid *only* if it is listed as a separate line item. Moreover, Adkins admitted that he was not certain that this overage estimate would suffice to account for a starter ([Filing No. 108-3 at 26](#)). Because the Court cannot be satisfied of the reliability of Adkins' opinions on the necessity of starter strips, this opinion should be excluded.

### c.   **MRP Program**

Like Adkins' other opinions, Defendants argue that "his opinions regarding the benefits to using a local shingles supplier have not been subjected to any testing and thus are inherently unreliable." ([Filing No. 108 at 20](#).) Defendants point out, "Adkins admits that he has no knowledge regarding the MRP Program." *Id.* They argue with this insufficient knowledge, Adkins' opinion should be excluded. *Id.* at 20–21. Moreover, the process Adkins uses to choose a shingle supplier is irrelevant when the issue "is whether the amount that Consolidated paid to [Beyers] for replacement shingles was the reasonable replacement value for his damaged shingles." *Id.* at 21. In other words, "Adkins' opinion regarding the factors he considers in selecting a shingles supplier do not relate to how [Beyers] can prove breach of contract claims". *Id.* at 22.

13

In response, Beyers argues that though Adkins "does not possess any specific information about MRP or its suppliers," he merely opines "that general contractors will not automatically use MRP suppliers because they offer discounted pricing, rather the decision is based on a number of other critical factors." (Filing No. 124 at 13.) Additionally, Adkins' "personal knowledge and extensive experience" support his opinion, so peer review and scientific testing is not mandatory for him to render an opinion. *Id.* Finally, Adkins' testimony as to the factors he considers when selecting a shingle supplier are relevant when it "helps rebut Defendant[s'] presumption that discounted pricing together with free shipping from a solitary supplier can set the ACV[1] of replacement shingles." *Id.* at 14. "MRP's discounted pricing is not available to ordinary customers," Beyers concludes, "because their discounts would likely not lure general contractors to ditch their existing suppliers". *Id.*

In reply, Defendants argue that even if Adkins' opinion is "narrow," it is still "unreliable and irrelevant." (Filing No. 128 at 9.) First, "Adkins does not offer any objective support for his opinion." *Id.* Without this "objective and reliable basis," the Court should exclude Adkins' opinion, Defendants urge. *Id.* Moreover, "whether general contractors 'automatically use MRP suppliers' to obtain MRP 'discounted' pricing does not prove that Consolidated failed to provide an adequate payment for replacement shingles." *Id.* In other words, Adkins' opinion does not answer this specific "breach of contract question." *Id.* Ultimately, "the factors that roofers may or may not consider in choosing a shingles supplier have nothing to do with breach of an insurance policy." *Id.* at 10. Finally, because "the MRP Program's pricing is based upon the price for materials within the relevant market" and "uses suppliers located throughout the country," there is

---

[1] Actual cash value.

no presumption—"that discounted pricing together with free shipping from a solitary supplier can set the ACV of replacement shingles"—to rebut. *Id.*

Defendants contend Adkins has conceded that he has no basis to form an opinion on the MRP program when he testified: "I don't know anything about it." (Filing No. 108-3 at 28.) The Court is persuaded; because Adkins lacks even basic familiarity with the MRP program, his opinions on whether payments derived from it could adequately compensate Beyers lack reliability and should be excluded.

### d.  <u>Conclusion</u>

For the preceding reasons, the Court **grants** Defendants' Motion *in Limine* to Strike Plaintiff's Expert Witness Randal Adkins, (Filing No. 107), striking his testimony and any related evidence, including his expert report.

### 3.  <u>Defendants' Motion *in Limine* to Strike Poland</u>

Poland, the owner/president of Spartan Claims, LLC's duties include supervising and adjusting and appraising property insurance claims. (Filing No. 110-2 at 21).   He has personally adjusted almost five hundred claims on behalf of his company. *Id.*  He has not testified as an expert witness in any litigation in the past ten year. *I*d. at 1. Beyers offers the Poland, as a purported expert witness regarding: (1) whether a general contractor's overhead and profit should be paid for shingles and gutter repair/replacement projects; (2) a roofing contractor's practice of using a starter strip for the first course of shingles and method of estimating the costs for same;  (3) how roofing contractors select a shingles supplier; (4) the inclusion by Consolidated for removal costs for certain roof peripherals, such as flashing and vents, on the Xactimate estimate used to pay Plaintiff;

and  (5) identification of purported class members. Based on the following, Defendants' ask the Court to strike Poland's expert testimony and report.

### a.    Qualifications

In addition to assessing the "relevance" and "reliability" of an expert witness' opinion, courts must evaluate the "qualifications" of the expert.  *See Gopalratnam*, 877 F.3d at 779.  Though broken out as a separate factor to analyze, an expert's qualifications help inform the reliability of his opinion.  *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions.").  An expert may be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."  *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quotation omitted).

Defendants argue that "Poland is not qualified to opine on roofing practices." (Filing No. 110 at 13.)  Poland offers his opinions based on "his experience as a public and insurance claims adjuster" and admits that he "has no roofing experience."  *Id.*  Thus, argue the Defendants, Poland simply is not qualified to opine on "the kind or amount of coordination required to complete a shingles and gutter repair job, the propriety of using a trimmed shingle to serve as a starter row, and the process of removing roof peripherals in conjunction with the roof's shingles." *Id.* (citations omitted). Because "Poland's adjusting experience in the insurance industry does not qualify him to opine regarding roofing or guttering practices, . . . the Court should exclude all of his report, which is based on construction and contractors' practices."  *Id.* at 14.

In response, Beyers notes that Poland "owns and operates the largest public adjusting firm focusing on residential claims" in Indiana and "has personally adjusted hundreds of claims and been directly involved with thousands of roof damage claims." (Filing No. 125 at 3.)  Moreover, Poland has interacted with "hundreds of contractors about roof repair" and meets with "general contractors on a daily basis".  *Id.* at 3–4.  He has made "hundreds of site visits" and is "often involved with or participates in every aspect of a repair project." *Id.* at 4. Beyers argues that "Poland's extensive experience and knowledge make him ideally suited to opine on steps and coordination required to complete a Gutter and Shingle Repair Project."  *Id.*  Moreover, "Poland has had hundreds of conversations with general contractors specifically about the use of starter strips." *Id.* at 9. Without intimate knowledge of industry standards, including the proper implementation of starter strips, "Poland and his staff would be unable to determine the various components of their damage estimates or advocate on behalf of their clients." *Id.*  In other words, "Poland is [ ] required to regularly rely upon industry standards when creating damage estimate[s]," qualifying him to opine on industry standards including, but not limited to, starter strips.  *Id.* at 9.

In reply, Defendants argue that because Poland "has no construction experience[] and no experience replacing or repairing shingles or gutters," the Court should "exclude Poland's opinion regarding these and other construction practices about which he is unqualified to opine." (Filing No. 129 at 3–4.)  Defendants argue that because in a January 2020 decision, Judge Magnus-Stinson excluded the insurance adjusting practices opinions of Adkins, a commercial and residential roofing contractor—who just happens to be the other expert at issue in this case—it should now exclude Poland's opinions about roofing practices.  *Id.* at 3.

In excluding Adkins' opinions in an earlier case, Judge Magnus-Stinson noted that even though he "regularly interacts with insurance companies, this alone does not qualify Adkins to opine about insurance industry standards." *Rocklane Co., LLC v. Travelers Cas. Ins. Co. of Am.*, No. 117-cv-2158-JMS-DLP, 2020 WL 1320963, at *8 (S.D. Ind. Jan. 21, 2020).  The inverse is true here: despite regularly interacting with contractors both on and off job sites (*see* Filing No. 125-1 at 1–2), Poland is not qualified to offer his opinions on construction practices.  Yes, Poland owns and operates one of the state's largest adjusting firms focused on residential claims.  *See id.* But his involvement in repairs is limited to maximizing the value for his clients.  This "knowledge, skill, experience, training, [and] education" does not qualify him to opine on matters of roofing *construction* practices, including "the kind or amount of coordination required to complete a shingles and gutter repair job, the propriety of using a trimmed shingle to serve as a starter row, and the process of removing roof peripherals in conjunction with the roof's shingles."  (*See* Filing No. 110 at 13 (citations omitted).)  For this reason alone, Poland's opinions on these matters should be excluded.  *See Gayton*, 593 F.3d at 616.

### b.      Opinions Outside Scope of Expert Report

Defendants also argue that any opinions offered outside the scope of Poland's expert report should be excluded (Filing No. 110 at 14–15).  Poland's report did not include any opinions, Defendants contend, on

1.      Shingle removal practices—including the removal of certain roof components or peripherals (vents, flashing, gable cornice returns) at the same time and in the same work as removing shingles;

2.      Proper estimating practices for including costs to remove roof peripherals and a starter course of shingles;

3.      Alternative estimating methods to account for the cost of a starter course; and

> 4. The sufficiency of the price for shingles paid to Plaintiff by Consolidated, or to any alleged class member, under the MRP Program.

*Id.* at 15.  Because courts "exclude expert opinions outside the scope of the written report," Poland's testimony on the above matters should be excluded.  *Id.* at 16.

In response, Beyers argues that this request is meritless: "Courts around the country, including this Circuit, allow testimony at trial based upon disclosures included in written reports as well as depositions."  ([Filing No. 125 at 14](#) (citing *Saad v. Shimano Am. Corp.*, No. 98 C 1204, 2000 U.S. Dist. LEXIS 10974, at *66-67 (N.D. Ill. July 21, 2000)).  And even if the Court disagrees with this interpretation of law, any omission "was harmless and effected no prejudicial impact upon the Defendant[s]."  *Id.* at 15. Beyers is not "ambush[ing] Defendants with new unvetted testimony at trial"; instead, they had "ample opportunity to question" Poland on any of his supplemental opinions.  *Id.*  Moreover, "much of the testimony central to Defendants' objections was offered in response to direct questions asked by the Defendants' counsel." *Id.* Ultimately, as this Court has noted, "'rejections of expert testimony is the exception rather than the rule.'" *Id.* at 16 (quoting *Lauderdale v. Russell*, No. 1:16-cv-2684-TWP-TAB, 2019 U.S. Dist. LEXIS 220862, at *3-4 (S.D. Ind. Dec. 26, 2019)).

In reply, Defendants contend Beyers "improperly asserts that Poland's opinions should not be limited to those in his expert report and instead, can include those to which he testified during rambling responses to questions during his deposition." ([Filing No. 129 at 2](#).) As the Seventh Circuit has held, however, "'Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony.'"  *Id.* (quoting *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008)).  Paired with the inability for Defendants to "rebut Poland's opinions provided for the first time during his deposition", the Court should exclude his opinions

on "(1) practices for estimating the cost of a starter course, or (2) the sufficiency of an estimate for a start[er] course or replacement shingles based on MRP pricing." *Id.*

As Defendants note, parties cannot cure expert reports that fall short through later depositions. The reason for this is simple: "to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify." *Ciomber*, 527 F.3d at 642. "This purpose would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony." *Id.* Failure to comply with the disclosure requirements set forth in Rule 26(a), then, results in exclusion *unless* the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c). While the Court has broad discretion in determining whether an error is harmless or justified, it should consider "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Banister v. Burton*, 636 F.3d 828, 833 (7th Cir. 2011) (quoting *Westefer v. Snyder*, 422 F.3d 570, 585 n. 21 (7th Cir. 2005)). Here, Poland started opining on previously undisclosed matters during his deposition, prejudicing Defendants because they did not have the opportunity to prepare to scrutinize these opinions. In other words, contrary to Beyers' claim that they had "ample opportunity to question" Poland on his nondisclosed opinions, any of these efforts were immobilized when Defendants had no meaningful opportunity strategize their attack. And with Beyers relying on Poland's opinions on summary judgment and class certification, there was little opportunity to cure. For this reason, Poland's later-disclosed opinions on starter course and replacement shingle pricing should be **excluded**.

c.     **GCOP**

Defendants next contend that Poland's opinion about GCOP is unreliable and irrelevant (Filing No. 110 at 16).  First, the basis for Poland's opinion that GCOP should always be paid for gutter and shingle work "is simply that the contractor performing the shingles and gutter work has advertising, office, and legal expenses that should be included when estimating a roof claim." *Id.* But this conclusion is not supported by any "well-recognized principles," which instead instruct that "the cost to perform a repair should include GCOP *only* when the services of a general contractor are reasonably necessary—not for every shingles and gutter repair project or because the contractor incurs certain operating expenses."  *Id.* at 16–17 (citations omitted) (emphasis in original).  In fact, courts and industry publications and software programs direct that "the services of a general contractor are reasonably necessary *only* when a job is complex or requires coordination among several trades." *Id.* at 17(citations omitted) (emphasis in original). Moreover, Poland even "testified that while working as an adjuster, he did not include GCOP for every claim requiring shingle and gutter repairs," contradicting his own opinion.  *Id.* at 18.  Because this always-pay-GCOP opinion is "unsupported by the relevant community," the Court should exclude this testimony.  *Id.* at 18.  Additionally, "the standard endorsed by Poland"—that GCOP is owed when a policyholder *actually* uses a general contractor—"does not support a payment of GCOP" here because Beyers and any purported class members did not have repairs completed.  *Id.* at 19. Finally, even though Poland opines that GCOP is owed because shingle and gutter contractors must pay "advertising, legal, financing, payroll, and software costs," the pertinent issue "is whether Consolidated improperly failed to pay GCOP to" Beyers. *Id.* at 20. "Because Poland's opinion regarding expenses incurred by contractors" is unrelated—and thus not relevant—to the issue at hand, it "should be excluded."  *Id.* at 21.

In response, Beyers argues that "Poland's opinion does not run [a]foul of any existing legal standard or legitimate industry practices." (Filing No. 125 at 5.) "Without a general contractor," Beyers contends, "homeowners would have to undertake [numerous administrative] tasks themselves as sub-contractors in Indiana do not maintain a back-office support staff". *Id.* at 6. GCOP costs, then, should be included when "an Indiana insured needing shingle and gutter repair/replacement will **reasonably expect** to hire a general contractor to perform such services". *Id.* (Emphasis in original.)  Beyers argues that the Court should rebuff any request to impose "an unfounded complexity and coordination requirement" for the use of a general contractor. *Id.* at 7. Finally, he asserts that Poland's opinion on GCOP is relevant for two reasons: "(1) overhead costs necessary to perform Gutter and Shingle Repair Projects explain why the market is dominated by general contractors willing to incur such costs; (2) The [sic] overhead costs help identify components of the GCOP which are incurred by services providers and owed to putative GCOP Class Member". *Id.* at 8.

In reply, Defendants argue that "Poland's GCOP Opinion—which is merely a self-proclaimed rule that GCOP is owed on all claims that include shingle and gutter repairs—does not prove Consolidated's liability on an individual or classwide basis." (Filing No. 129 at 4.) They contend this opinion has "no bearing" on any issue of the lawsuit.  *Id.*  Because "Consolidated's liability turns on the contract's language and, if necessary, Consolidated's claims handling practices," Poland's opinion is irrelevant and should be excluded under Rule 702.  *Id.* at 5.

The Court agrees that Poland's GCOP opinion is unreliable and should be excluded.  As Defendants note, industry standards widely conflict with the opinion that GCOP is owed on every gutter and shingle repair (*see* Filing No. 110-12 at 4; Filing No. 110-14).  Though this alone suffices to exclude the opinion, *see, e.g.*, *Gopalratnam*, 877 F.3d at 784, Poland's own testimony

contradicts his opinion as he affirmed: "I have applied overhead and profit to roof only claims under *certain circumstances*." (Filing No. 110-3 at 9 (emphasis added).)  For these reasons, the Court finds that Poland's opinion on GCOP is unreliable.

> ### d.    Starter Strips

Defendants also argue that Poland's opinions about starter strips are unreliable and irrelevant.  "Poland opines that a manufacturer-designed starter strip is the only 'suitable' product to serve as a starter row." (Filing No. 110 at 21.) This assertion, however, is (1) "unsupported by industry standards, including technical bulletins by shingle manufacturers," (2) "contradicted by the materials upon which he replies," and (3) "inconsistent with the opinions of [Beyers'] only other identified expert."  *Id.*  First, "most (if not all) shingle manufactures expressly disagree with Poland[]" when their literature provides that tabbed shingles with the tab portion removed can serve as starter courses.  *Id.* at 22–23.  Second, Poland relied on one exhibit that expressly stated that a starter course "requires the use of a shingle product specifically designed for use as the starter row . . . ***or requires that the tabs of a conventional shingle be trimmed***", and another exhibit that "says nothing about the use of trimmed laminated shingles for a starter row." *Id.* at 23 (citation removed) (emphasis Defendants').  Third, Poland's opinion is contradicted by Adkins, who testified that "some manufacturers do allow you to cut the shingle and make a starter strip." *Id.* at 24 (citation omitted).  Moreover, "Poland does not opine that inclusion of a waste factor is an improper method of accounting for the cost of a starter row," and instead contends that this factor was not "substantiated." *Id.* The estimate created, however, "includes a table that provides guidance for calculating 'appropriate waste factor percentages.'" *Id.* at 25 (citation omitted). Though the table provided that Beyers was owed "0%" waste factor, he was paid for "12%" more coverage area than his roof required. *Id.*  Finally, because the issue in the case "is not how the cost

of a starter strip should be calculated"—and is instead whether Beyers was paid for a starter row— Poland's opining on "a method for calculating the cost of a starter strip used when the cost for the same is accounted for as a separate line item on the estimate" should be excluded as irrelevant. *Id.* at 26.

In response, Beyers argues that Poland's testimony about starter strips is reliable because he and Adkins "agree that it is the industry standard to use starter strips to seal rake and eves whenever shingles on an entire slope or the entire roof are replaced." ([Filing No. 125 at 10.](#)) Indeed, most "manufacturers recommend the use of a starter strip to seal rake edges and eves *and not trimmed 3-tab shingles*." *Id.* (Emphasis added.)  This dedicated strip is preferable, according to Poland, because it "provides better protection" and "is more cost effective" and because the format of newly designed three-tab shingles make them unsuitable to "be effectively trimmed and used as starter shingles." *Id.* at 10–11.  Additionally, Poland's opinion about an "insufficiency of the waste factor" has gone unrebutted when a report Defendants provided—instead of a recommending a 0% waste factor—"does not provide a recommended waste factor" at all. *Id.* at 11. Finally, Poland's testimony about calculating the cost of a starter strip is relevant when the method can help determine whether "waste factors" adequately encompassed the cost of starter strips and can help determine damages. *Id.* at 12.

In reply, Defendants argue that no industry standard supports Poland's contention that starter strips must be used ([Filing No. 129 at 8](#)).  Instead, even Adkins—another of Beyers' expert witnesses—testified that "some manufacturers do allow you to cut the shingle and make a starter strip," which itself is supported by "industry publications." *Id.* at 8.  In any event, any industry standard about the use of starter strips is immaterial to whether "Consolidated breached its

insurance contracts by paying for the cost to repair [Beyers'] damaged property by including the cost of starter strips within the cost of excess shingles." *Id.* at 8–9.

The Court again finds Poland's opinion unreliable because it is unsupported—and indeed contradicted—by industry standards that widely recognize that trimmed 3-tab binders can suffice as a medium for a starter course (*see, e.g.*, Filing No. 110-13 at 3 (instructing that a starter course can be created by using dedicated starter strips "or three-tab self-sealing shingles with the lower tab portions removed"); Filing No. 110-15 at 7 (defining starter strip as "first course of roofing installed[, u]sually trimmed from main roof material"); Filing No. 110-6 at 1 (noting that, as an alternative to using a dedicated starter strip, "trimming laminates . . . is also acceptable")). Because Poland's opinion is not supported by generally accepted practices in the field, it is unreliable and should be **excluded**.

### e.    <u>MRP Program</u>

Defendants also maintain that Poland's opinions on the MRP program are unreliable and irrelevant (Filing No. 110 at 26). The question, Defendants contend, is whether Beyers "was damaged by Consolidated's use of the MRP Program to estimate the reasonable replacement cost" of shingles, and Poland's lack of knowledge of the arrangement are irrelevant. *Id.* at 27. Moreover, Poland's lack of experience with the MRP Program makes him an unreliable witness on the matter: simply put, he has "no basis upon which to opine about the MRP Program." *Id.*

In response, Beyers maintains that Poland "has never encountered any contractor who uses the MRP program to purchase shingles." (Filing No. 125 at 12.) This, Beyers contends, "is not opinion but an expression of Mr. Poland's first-hand observations," removing the statement from any *Daubert* analysis. *Id.* In any event, this observation "is relevant because it underscores the impropriety of using MRP discounted pricing when calculating the ACV of replacement shingles"

when Poland, despite his extensive Indiana contacts in the industry, "is not aware of a single general contractor availing discounted pricing offered by MRP." *Id.* at 13.  And the observation is reliable when "it is based upon Mr. Poland's first-hand observations and not colored by his ignorance about the MRP program." *Id.*

In reply, Defendants argue that these "expressions of Poland's 'first-hand observations' are not relevant—as either fact or opinion testimony." (Filing No. 129 at 10.)  In fact, Defendants argue, Poland's knowledge of the use—or nonuse—of the MRP Program "has no bearing on whether an estimate based on MRP shingle pricing is reasonable." *Id.*  Because " Poland's opinions [do not] help to determine whether the estimate for repairs was unreasonable because Consolidated relied on MRP," the Court should exclude them.  *Id.*

Again, Poland's opinion is unreliable: he lacks relevant knowledge to discuss the MRP Program.  Poland admits that he has never "encountered any contractor who has used [the MRP Program]." (Filing No. 110-2 at 19.)  This lack of experience with the program renders Poland unable to opine on whether calculations based on it could sufficiently compensate Beyers for replacement shingles. *See Wintz By and Through Wintz v. Northrop Corp.*, 110 F.3d 508, 513 (7th Cir. 1997) (affirming exclusion of expert testimony when expert's qualifications "simply were not sufficient to permit him to offer an expert opinion" on certain topics in the case).

### f.   <u>Roof Removal Costs</u>

Defendants argue that Poland's testimony about roof removal costs is neither reliable nor relevant (Filing No. 110 at 27).  Though Poland opined that removal costs for roof peripherals were not included in the estimate because they would be listed as "separate line items," the evidence shows otherwise. *Id.* at 27–28. Defendants point out that the software used to create Beyers' estimate, includes "removal costs for peripherals . . . within the line item for the cost of

shingles removal within [Beyers'] estimate." *Id.* at 28. Indeed, "shingle removal costs include removal costs for both shingles and vents, flashing, and other roof peripherals because contractors remove all of them with the same task." *Id.* And Poland admits that he has no knowledge on the software's estimating of this cost. *Id.* at 29–30. Defendants contend that because the basis for Poland's opinion "is based on incomplete knowledge at best, his testimony regarding the same should be excluded." *Id.* at 30. Finally, Defendants argue the question "is whether the payment [Beyers] received to complete the roof repairs was sufficient," thus, Poland's opinion on how roof peripherals are itemized for removal "is not relevant to any issue before the Court" and should be excluded. *Id.*

Beyers does not respond to this argument and, according to his summary judgment response brief, "is no longer pursuing" an allegation "against Defendants for failure to pay cost of dump fees, hauling, disposal and labor associated with the removal of Flashing, Roof Vent, Continuous Ridge Vent, and Gable Cornice Return." (Filing No. 130 at 1 n.1.) Since Beyers has abandoned the contention for which Poland's opinion provided support, the Court need not resolve whether it will exclude his opinion on roof removal practices.

### g.   Putative Class Member Identification

Finally, Defendants argue that any identification of purported class members by Poland should be excluded (Filing No. 110 at 30). Because "[m]any insureds will complete repair work . . . [and] have no reason to tell Consolidated that repairs were completed," Poland's methodology of reviewing claim files to determine whether they include an "indication that the insured completed the repairs" cannot serve as a firm basis for identifying potential class members. *Id.* at 31.

In response, Beyers argues that Poland's methodology is "squarely aimed at providing a feasible road map for ascertaining class members." (Filing No. 125 at 13.) Moreover, since Poland's methods were disclosed, the proposed "class definition has been narrowed to include only individuals for whom 'Liberty Mutual was not notified about completion of repairs to the roof system by the policyholder or otherwise.'" *Id.* (citation omitted). This modification—further limiting the class—should address Defendants' critiques, Beyers contends. *Id.* at 13–14.

In reply, Defendants argue that Beyers' "identification of class members is a moving target—and, more importantly, Poland identified purported class members for proposed classes that Plaintiff no longer seeks to certify." (Filing No. 129 at 10.) This evinces the irrelevance and unreliability of Poland's opinion on class members, bolstering why it should be excluded. *Id.*

This last point by Defendants is well taken: any identification of class members by Poland is now obsolete considering Beyers has since "narrowed" his class categorization. For this reason, Poland's opinion on class membership is irrelevant and should be excluded.

### h.   <u>Conclusion</u>

For the preceding reasons, the Court **grants** Defendants' Motion *in Limine* to Strike Plaintiff's Expert Witness Aaron Poland (Filing No. 109), striking his testimony and any related evidence, including his expert report.

## B.   <u>Defendants' Motion for Summary Judgment</u>

Defendants seek judgment as a matter of law as to Beyers' four claims against them for breach of contract, following hail damage to his roof. Defendants contend Beyers' Second Amended Complaint conjures claims that do not exist as his insurance claim was promptly investigated and paid by his insurer, and his four individual claims—breach of contract related to (1) GCOP, (2) removal costs, (3) starter strips, and (4) replacement shingles— are all defeated by

the plain language of Consolidated's estimate that was given to him, the policy of insurance, and common sense.  (*See* Filing No. 91 at 1–2.)  Each claim will be discussed after the Court resolves a matter involving yet another of Beyers' expert witnesses.

### 1.   Fako Expert Report

Defendants, in their reply brief, argue that the Court should not permit Beyers to rely on an expert report prepared by Edward Fako ("Fako") first disclosed with his response brief.  (Filing No. 135 at 1–2.)  Defendants argue that this tardy disclosure forced them to respond to an expert report "that they had no opportunity to challenge or rebut." *Id.* at 2. Though the Court granted Beyers additional time to conduct discovery for his individual claims—as opposed to that conducted for class certification—Defendants contend the Court did not grant him time "to file still more 'expert' reports." *Id.* They contend this conflation of deadlines has "muddled the record" by essentially creating an "artificial merits-class certification dichotomy." *Id.* Defendants argue that flouting the deadline alone should lead the Court to strike Fako's report. *Id.* at 3. And regardless, Fako's report is "inadmissible hearsay" because it fails to include a "declaration or affidavit from Fako placing it in evidence." *Id.*

Defendants assert two reasons in support of their argument that the Fako report "contains irrelevant and unreliable opinions." *Id.* First, Fako's opinions—which involve the practices of roofing contractors—"are immaterial to Plaintiff's breach of contract claims," which turn instead on "the language of [Beyers'] policy."  *Id.* at 4.  Second, "there is no objective support for the 'gutter and shingle repairs' rule" that Fako forwards: that a general contractor is always necessary

29

for those repairs.  *Id.*  And, Defendants contend, "Fako's opinions that the use of Starter Strips is the industry standard . . . are contradicted by Plaintiff's other experts."  *Id.* at 5.[2]

Beyers rebuffs these arguments in his surreply.[3] Beyers first acknowledges that Fako's report should have been accompanied "by an affidavit or another form of sworn testimony," informing the Court that he would concurrently seek leave to include the omitted affidavit.[4] (Filing No. 137 at 3.) Beyers then argues that his "reasonable interpretation" of the scheduling order permitted him to disclose the Fako report with his response brief when that deadline "expressly limit[ed] the disclosure deadline to experts used for class certification." *Id.* at 4. Moreover, the Court's later order permitting additional discovery "lends credence to the reasonableness of [Beyers'] interpretation." *Id.* As for Defendants' assertion that they were blindsided by the report,

---

[2] Defendants also object here to the opinions of Poland and Adkins. (Filing No. 135 at 5–7). But because these arguments (and Beyers' in his surreply (*see* Filing No. 137 at 10–13)) duplicate those already addressed on Defendants' motions *in limine, see supra* Section II.A., the Court need not address them again now.

[3] Beyers moved to file a surreply to respond to Defendants' reply brief but erroneously filed his surreply brief at the same time (*see* Filing No. 136; Filing No. 137). Defendants opposed the motion (Filing No. 142), and, after moving to strike the mistakenly filed surreply (Filing No. 145), Beyers replied in support (Filing No. 146). The Court—after considering the briefing and examining the tendered surreply—**grants** Beyers' motion to file the surreply (Filing No. 136). In as far as it exceeds the scope of what is permitted in a surreply (*see* Filing No. 142 *passim* (arguing that only a portion of the surreply addresses attacks on the admissibility of evidence in Defendants' reply brief)), the Court will only consider and discuss those contentions it deems permitted by Southern District of Indiana Local Rule 56–1(d). Since the Court will consider the already filed surreply when examining Defendants' summary judgment motion, it **denies** Beyers' motion to strike (Filing No. 145).

[4] Beyers indeed moved to append the unintentionally omitted affidavit to Fako's expert report. (Filing No. 138 at 1–2). This amendment, Beyers contends, will not unfairly prejudice Defendants and is necessary so the Court can consider the "useful and carefully crafted expert report put together by a well reputed industry professional with decades of construction experience." *Id.* at 2. In response, Defendants argue that they are prejudiced because they hired experts specifically to rebut the reports of Poland and Adkins, which Beyers "*did* timely submit." *Id.* at 2–3 (emphasis Defendants'). Moreover, Defendants point to other errors (or worse) committed by Beyers' counsel in this and other cases, urging that "repeated failure to follow rules of conduct that apply to everyone should not be allowed to continue." *Id.* at 4–5. In reply, Beyers argues that Defendants focus on the wrong issue by arguing that the report itself prejudices them, not that they would be prejudiced by the amendment. (Filing No. 147 at 2). Moreover, Beyers contends that he engaged in discovery related to the merits "within the class certification discovery deadlines and such expert disclosures were furnished to the Defendant[s] within the class certification expert disclosure deadlines." *Id.* at 3. The Court, having considered these arguments, **grants** Beyers' motion for leave to amend (Filing No. 138). In short, because a "belated affidavit is sufficient to support the use of [an expert] report at the summary judgment stage," *Harpold v. Ethicon Endo–Surgery, Inc.*, 2009 WL 688984, *1 (S.D. Ind. 2009), the Court will permit Beyers to cure this deficiency through amendment.

Defendants knew Beyers intended to submit oppositional expert reports when he "outlined the nature of such expert testimony in explicit details in" briefing requesting a stay of summary judgment proceedings.  *Id.*  Regarding concerns the Fako report would "muddle of the record," Defendants invited that potentiality by moving for summary judgment before class certification was resolved and "chose not to mitigate the unintended effect of the [report] by either deposing him or presenting rebuttal testimony." *Id.* at 5. Responding to attacks on the relevance and reliability, Beyers first contends that the GCOP opinion is relevant because Fako "has opined that GCOP is incurred in all Gutter and Shingle Replacement Projects in Indiana, including repairs needed by the Plaintiff, because such projects are almost always serviced by general contractors." *Id.* at 6. As for the reliability, Beyers contends that the GCOP opinions are based on Fako's "personal knowledge or experience" and he "includes a detailed explan[a]tion for his opinions." *Id.* at 8–9. And Fako's opinions on starters strips derive relevance from the fact that "[i]f the industry practices require the installation of a Starter Strip on Mr. Beyers' roof, the ACV of installing the Starter Strip should have been included in Mr. Beyers' Estimate and subsequent ACV payment." *Id.* at 9–10. And the opinion is reliable because Beyers' other "experts have also testified that the industry standard followed by a majority of service providers is to use starter strips"— even when they have also "testified that in a few select isolated instances contractors may use 3-tab trimmed shingles as a starter strip" and "a few manufacturers [ ] allow the use of 3-tab isolated shingles in lieu of a starter strip."  *Id.* at 10.  In other words, the industry standard advanced by Fako "is not changed by the existence of some exceptions and variants."  *Id.*

Much like the expert opinions discussed above, Defendants offer several reasons why Fako's opinions are not reliable and are not supported by industry standards. First, industry standards conflict with the opinion that general contractors are necessary for every gutter and

shingle repair (*see* Filing No. 110-12 at 4; Filing No. 110-14).  Second, Beyers concedes that even

his own experts cannot agree that industry standards dictate that a dedicated starter strip should

always be used (*see* Filing No. 137 at 10).  Indeed, as noted above, this opinion forwarded by Fako

is belied by industry publications (*see* Filing No. 110-13 at 3; Filing No. 110-15 at 7; Filing No.

110-6 at 1).

As noted in a prior case, "[i]t would be an understatement to say that the inadmissibility"

of a plaintiff's expert reports and opinions—here, those of Adkins, Poland, and now Fako—is

"problematic" when opposing summary judgment, especially when these opinions "almost

exclusively" support the theory of liability.  *Estate of Williams v. Indiana State Police*, 26 F. Supp.

3d 824, 839 (S.D. Ind. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468

(7th Cir. 2015).  But, like in *Estate of Williams*, "this was a problem of [Beyers'] own making."

*Id.*  That said, even if the experts reports and opinions were admissible, the Court finds, as

discussed below, that Beyers' claims would not survive  summary judgment.

### 2.  <u>Summary Judgment Standard</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary

judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v.

Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary

judgment, the court reviews "the record in the light most favorable to the non-moving party and

draw[s] all reasonable inferences in that party's favor."  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th

Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

**3.   GCOP**

Beyers contends that Consolidated breached the policy by not paying him GCOP--the actual cash value of the overhead and profit of a general contractor to coordinate subcontractors --when they repaired and/or replaced his roof and gutters. Defendants argue that GCOP is not owed because Beyers' "roof and gutter damage claim was neither complex nor required coordination of work." (Filing No. 91-1 at 13.) Defendants contend "a loss may include a general contractor's overhead and profit," but "only when a general contractor would reasonably be

required to coordinate repairs that are part of the loss." *Id.* at 10 (citations omitted). Though "Indiana has not adopted a specific test in determining whether a general contractor would reasonably be used to coordinate repairs," the prominent view requires analysis of "the scope and type of repairs required". *Id.* at 11. Other courts "have applied a three-trade rule," presuming the need for a general contractor when three or more trades are necessary for a repair. *Id.* Here, Beyers "offers no specifics to explain how or why a general contractor's coordination or supervision was needed to repair his roof and gutters." *Id.* at 13. And even if two subcontractors were needed to separately replace the roof and gutters, "the work to replace both is not complex and would require little coordination of work between the two." *Id.*

In response, Beyers contends that joint roof and shingle repairs "are almost always serviced by general contractors." (Filing No. 130 at 10.) General contractors are needed, Beyers contends, because they maintain a back-office support staff, manage project sites, and maintain the funds and relationships to best deliver adequate repairs. *Id.* at 11–12. And, Beyers argues, Defendants do not adequately rebut his contentions when they merely rely upon employee, non-expert testimony, as opposed to the "three qualified experts" he puts forth. *Id.* at 12. Beyers argues his "estimate does not include a separate line item for GCOP and consequently fails to include the necessary cost of hiring a General Contractor." *Id.* at 14.

In reply, Defendants argue "[it] is undisputed that the standard for determining whether payment of GCOP is warranted turns on whether the services of a general contractor are reasonably necessary to complete repairs," any evidence about a universal "gutter and shingle repairs" rule is irrelevant to determining this individual claim. (Filing No. 135 at 7–8.) Though Beyers "concludes a general contractor is reasonably necessary to complete his roof repairs simply because roofing contractors who call themselves general contractors and have overhead expenses

do those repairs," it is instead "the character of the repairs themselves that determines whether payment of GCOP is warranted." *Id.* at 9 (citations omitted). Moreover, "[c]omplexity and coordination are merely factors Consolidated's adjusters consider in making the discretionary determination of whether the services of a general contractor are reasonably needed and thus payment of GCOP warranted." *Id.* at 10. This is a flexible inquiry, not a "fixed rule." *Id.* Defendants argue that Beyers "has offered no relevant evidence to show that the services of a general contractor were needed to complete his roof repairs" when there is "no evidence that [his] repairs are complex [or] . . . require coordination among various construction trades." *Id.* at 11–13.

The parties agree that GCOP is owed when the "policyholder would be reasonably likely to need a general contractor in repairing or replacing the damaged property." *See Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1306 (11th Cir. 2008). But Beyers has not demonstrated that he would be reasonable likely to need a general contractor to repair his shingles and gutters. As Defendants note, the character of the individualized necessary repairs drives this inquiry. *See, e.g.*, *John v. Nat'l Sec. Fire & Cas. Co.*, No. 06-1407, 2006 WL 3228409, at *4 (W.D. La. Nov. 3, 2006), *aff'd*, 501 F.3d 443 (5th Cir. 2007) ("[T]here still has to be a factual inquiry into whether needing more than one trade contractor warrants a general contractor."). Here, Beyers argues that GCOP is owed because general contractors—broadly speaking—provide necessary operations to support gutter and shingle repairs. But these arguments do not address with any specificity why Beyers' repairs would need a general contractor. This is a flexible reasonableness inquiry, *see Mills*, 511 F.3d at 1306, determinate on particular repairs. Just as Beyers pushes against Defendants asserting any blanket "complexity" or "coordination" test, he too cannot broadly proclaim that general contractors are necessary for *every* gutter and shingle job. Instead, he must demonstrate why a

general contractor was needed for *his* repairs.  Beyers has not even attempted to do this, so this allegation fails.  *See, e.g.*, *John v. Nat'l Sec. Fire & Cas. Co.*, No. 06-1407, 2008 WL 394220, *2 (W.D. La. Feb. 12, 2008) ("The complaints, as amended, allege no facts that would demonstrate the need for a general contractor . . .").

### 4.   <u>Removal Costs</u>

The Court need not spend any time on this contention:  according to his summary judgment response brief, Beyers no longer maintains that Defendants failed "to pay cost of dump fees, hauling, disposal and labor associated with the removal of Flashing, Roof Vent, Continuous Ridge Vent, and Gable Cornice Return."  (<u>Filing No. 130 at 1</u> n.1.)

### 5.   <u>Starter Strips</u>

Defendants argue that Beyers "was sufficiently paid for the cost of a starter strip." (<u>Filing No. 91-1 at 16</u>.) Specifically, Beyers' estimate indicated that it included "'12% waste factor to include starter.'" *Id.* at 17 (quoting <u>Filing No. 91-2 at 4</u>). Though both 3-tab shingles and dedicated starter strips can be used, "Consolidated paid [Beyers] for the higher costs of using laminated composite shingles as starter strips by paying for 12% more shingles than necessary to install on his roof." (<u>Filing No. 91-1 at 17</u>–18.)  In other words, if Beyers had been paid separately for starter strips, the "cost he was paid for replacement shingles would go down, *at least equal to if not lower than* the cost of an equivalent roll of starter strip material." *Id.* at 18 (emphasis in original). So, even if a starter strip is "better" for the application, Beyers has already been paid at least enough for that cost. *Id.*

In response, Beyers contends that industry standard now mandates the use of a dedicated starter strip, not a trimmed 3-tab shingle. (<u>Filing No. 130 at 15</u>.) And, even so, "the 12% waste factor in [the] Estimate is insufficient to pay for both the shingle wastage and the cost of a starter

course (either a starter strip or 3-tab trimmed shingles)." *Id.* at 16.  In other words, even if the 12%

waste factor could go toward a starter strip's cost, that number simply does not suffice to cover the

expense of the course.  *Id.*

In reply, Defendants argue that, "in a transparent effort to defeat summary judgment,

[Beyers] acknowledges that Consolidated paid for Starter Strips within the waste factor, but asserts

that it was insufficient to pay for Starter Strips." (Filing No. 135 at 13.) Defendants note, however,

that these allegations "are absent from [Beyers'] Complaint." *Id.* Because courts, when deciding

summary judgment, "refuse to consider allegations (and evidence to support the same) not found

in the Complaint," *see Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996), this Court

"should disregard [Beyers'] attempt to frame his allegations one way to avoid highly individualized

inquiries that would defeat class certification, then recast his claims in an effort to create a dispute

regarding a material fact to avoid summary judgment." *Id.* at 13–14.  Moreover, any contrary

industry standard forwarded by Beyers "is immaterial to whether Consolidated paid [him] a

sufficient amount for a starter course of shingles." *Id.* at 15.  Finally, outside of the Fako report

first disclosed in response to summary judgment, Beyers has provided no admissible evidence to

support his claim that the 12% "waste factor was insufficient to cover the cost of a Starter Strip".

*Id.* at 16.

Beyers was fully compensated for the cost of a starter strip because his estimate explicitly

states that the quantity of replacement shingles paid includes a 12% waste factor, accounting for a

starter course and waste (*see* Filing No. 91-2 at 4).  In fact, recompensing Beyers in this manner

paid him *more* for a starter course than if it had been separately itemized (*see* Filing No. 91-7 at

2). While Beyers now argues for the first time in his response to Defendants' Motion for Summary

Judgment that "the 12% waste factor in his Estimate is insufficient to pay for both the shingle

wastage and the cost of a starter course", (Filing No. 130 at 16), plaintiffs may not amend their complaints through briefs opposing summary judgment when new allegations cut against prior factual bases for liability, *see Whitaker v. Milwaukee Cty., Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014). Beyers' Second Amended Complaint alleges that a "Starter Strip is both integral and necessary for Plaintiff's Roof Repair Project and must be included in the ACV calculation." (Filing No. 74 at 10.)  Indeed, the Second Amended Complaint maintains that trimmed 3-tab shingles "will not effectively waterproof the eaves and rakes of the roof." *Id.* When the estimate Beyers' received did not separately "include the cost of Starter Strip when calculating and issuing the ACV payments," Defendants breached the contract. *Id.* at 29. Because up to this point Beyers has consistently urged that starter strips *must* be separately itemized in an estimate and that breach occurred *because* they were not so listed, the Court will not permit Beyers to now argue that any additional waste factor payment was insufficient to cover starter course costs (Filing No. 74 at 10, 29). This change too drastically alters the allegations of the Second Amended Complaint to consider this argument on summary judgment.  *See Shanahan*, 82 F.3d at 781.

### 6.  <u>Replacement Shingles</u>

Finally, Beyers alleges breach of contract because Consolidated's" estimate provided pricing using the MRP program, in which insureds or their contractors can purchase shingles directly from suppliers nationwide at contractor rates, rather than using the market rate of shingles in Indiana.

Defendants argue this contention, that MRP pricing does not reflect the market rate of shingles in Indiana is "baseless" and "untrue." (Filing No. 91-1 at 18.)  Defendants start by noting that "Consolidated has a relationship with MRP, which provides insureds' contractors the ability to purchase shingles direct from suppliers throughout the country," that "suppliers offer

replacement shingles at the same price listed in a Consolidated estimate," and that the shingles are "the exact same" as those specified in any estimate. *Id.* at 18–19. Defendants argue that by basing its estimate on the price available through the MRP program, Consolidated met the policy's requirement of paying the actual cash value of a loss. *Id.* Moreover, even though MRP is "based out of Colorado," the price it charges for shingles accurately reflects Indiana market rates because it has "a relationship with a supplier in Indianapolis[, Indiana] that could sell and ship to [Beyers] (or be picked up by his contractor) the exact shingles specified by his estimate and at the price he was paid by Consolidated." *Id.* at 20.

In response, Beyers argues that Defendants have underestimated the ACV of replacement shingles, that "MRP's discounted pricing does not adequately reflect the replacement cost of shingles in Indiana," and that "Defendants' have used inadmissible testimony in its Motion for Summary Judgment to justify the adequacy of MRP discounted pricing." (Filing No. 130 at 17.) First, Beyers asserts that MRP pricing "is inadequate because it disregards" the "widely recognized" standards for estimating shingle market price. *Id.* Second, calculating payment "based upon by a solitary supplier not used by service providers in Indiana" is "fully inappropriate" when contractors "try to exclusively purchase from their preferred supplier." *Id.* at 18. Indeed, "MRP's discounted pricing would likely not lure general contractors to ditch their existing suppliers." *Id.* Third, Beyers argues that Defendants' arguments rest on inadmissible hearsay. *Id.* at 19. Specifically, Beyers contends that the testimony of Liberty Mutual's employee Amod Saxena ("Saxena") is inadmissible because (1) Defendants did not produce their agreement with MRP concerning its ability to provide replacement shingles at the estimate price and deliver them for no extra charge and Saxena does not have personal knowledge about the practices and compliance with those terms of that agreement, and (2) Saxena's affirmation that pricing reflects a geographic

area is not supported by contractual language, is only applicable "generally," and his nonexpert opinion is based merely on his glancing at the key points of a "study previously conducted by the Defendant[s]." *Id.* at 20–22.

In reply, Defendants argue that Beyers has failed to prove "that the MRP shingle price [he] was paid and *at which he could have purchased replacement shingles* was not enough." ([Filing No. 135 at 17](#) (emphasis in original).) Additionally, the contention that "MRP shingle suppliers are almost never" used by Indiana contractors is "inaccurate and irrelevant." *Id.* at 18. Instead, "MRP will identify suppliers nationwide who will sell the same composite laminated shingles specified in an estimate to Consolidated's insureds or their contractors at a discounted price anywhere in the country." *Id.* In fact, one of these MRP suppliers is used by Adkins, contradicting the assertion that Indiana contractors "almost never" use MRP shingle suppliers. *Id.* (Citations omitted.) Even more importantly, Defendants contend, "the suppliers that contractors use and their reasons why are irrelevant to the material question of whether Consolidated breached [Beyers'] policy by relying on MRP pricing to estimate the cost of his replacement shingles." *Id.* Simply demonstrating that MRP pricing was used in the estimate does not prove that payment to Beyers "was insufficient to pay for replacement shingles," which he must show "to survive summary judgment." *Id.* at 18–19. In other words, Beyers "has not rebutted evidence that he could have purchased shingles from an MRP supplier at the price in his estimate, *prima facie* proof that Consolidated paid him fair market value for replacement shingles." *Id.* at 19. As for the admissibility of evidence in support, Saxena "merely provided a short declaration to show that there is an MRP supplier in Indianapolis from whom [Beyers] or his contractors could have purchased shingles at the price paid by Consolidated, not to set forth the terms of any contract between Defendants and MRP." *Id.* And, in any event, Saxena oversees the relationship with

MRP, providing him "personal knowledge regarding the mechanics of the MRP Program and pricing for replacement shingles available to insured and their contractor." *Id.* Finally, Defendants did not—and could not—rely on Saxena's deposition testimony when he was deposed "three months *after*" they moved for summary judgment. *Id.* at 20 (emphasis Defendants').

Beyers' policy compelled payment of the actual cash value of his loss, which represents "a pure indemnity contract, the purpose of which is to make the insured whole but never to benefit him because a [loss] occurred." *Rockford Mut. Ins. Co. v. Pirtle*, 911 N.E.2d 60, 65 (Ind. Ct. App. 2009) (citing *Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 352 (Ind. 1982)).   In other words, the type of coverage enjoyed by Beyers "indemnifies but does no more." *Travelers*, 442 N.E.2d at 353.  Defendants have demonstrated that Beyers could have replaced his shingles at the price paid by Consolidated under the MRP program for the exact shingles specified by the estimate (*see* Filing No. 91-5 at 10 (confirming that "the contractor directly purchases [shingles] from" MRP suppliers); Filing No. 91-6 at 5 (explaining that, through the MRP program, a company "will sell to the contractor the same product that we estimate at a discounted price and deliver it to the site.")).  This amount represents the actual cash value—making him whole and nothing more—of Beyers' loss (*see* Filing No. 91-2 at 4 ("This line item includes a shingle material allowance of $75.44 per square, which reflects current market prices in your area. Market prices were verified by MRP's Managed Material Program. The MRP Managed Material Program allows you or your contractor of choice to have materials delivered directly to your home for installation.")).  Beyers, instead of rebutting this point, focuses on requiring payment "based upon sound pricing methodology and extensive market surveys."  (Filing No. 130 at 17.)  But this argument ignores

that, while those pricing metrics could form the basis for a general market rate, Beyers could receive the actual cash value of his loss on a discounted basis through the MRP program.

### 7. <u>Conclusion</u>

In Indiana, "[i]nsurance contracts are governed by the same rules of construction as any other contract*." Empire Fire v. Frierson*, 49 N.E.3d 1075, 1079 (Ind. Ct. App. 2016). Because no allegation advanced by Beyers forms the foundation for a breach of contract claim against Defendants, the Court **grants** their Motion for Summary Judgment (<u>Filing No. 91</u>).

## C.   <u>Beyers' Motion for Class Certification</u>

When a court decides that the claim of a putative named plaintiff lacks merit—such as on an adverse summary judgment ruling—that decision "moot[s] the question whether to certify the suit as a class action," especially when "the ground on which the district court threw out the plaintiff's claims would apply equally to any other member of the class." *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995) (citations omitted).  Because the Court grants Defendants' Motion for Summary Judgment, it must **deny** Beyers' Motion for Class Certification as moot. As demonstrated *supra* Section II.B., no member of any potential class could prevail on these claims.

## III.   <u>CONCLUSION</u>

For the reasons explained above, Defendants' Motion *in Limine* to Strike Plaintiff's Expert Witness Randal Adkins (<u>Filing No. 107</u>) is **GRANTED**; Defendants' Motion *in Limine* to Strike Plaintiff's Expert Witness Aaron Poland (<u>Filing No. 109</u>) is **GRANTED**; Defendants' Motion for Summary Judgment (<u>Filing No. 91</u>) is **GRANTED**; Plaintiff's Motion to Amend Exhibit H (<u>Filing No. 138</u>) is **GRANTED**; Plaintiff's Motion to File a Surreply (<u>Filing No. 136</u>) is **GRANTED**; Plaintiff's Motion to Strike Plaintiff's Surreply (<u>Filing No. 145</u>) is **DENIED**; and Plaintiff's Motion

for Class Certification (Filing No. 111) is **DENIED**.   Plaintiff's breach of contract claim is

**DISMISSED**, and Final Judgment will issue under separate order.

       **SO ORDERED.**

Date:  3/19/2021

DISTRIBUTION:

Syed Ali Saeed
SAEED & LITTLE LLP
ali@sllawfirm.com

Dennis F. Cantrell
KATZ KORIN CUNNINGHAM, P.C.
dcantrell@kkclegal.com

Mark Allen Johnson
BAKER & HOSTETLER LLP
mjohnson@bakerlaw.com

Marissa A. Peirsol
BAKER & HOSTETLER LLP
mpeirsol@bakerlaw.com

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana